999 A.2d 415

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
TYSEN R. PRIVOTT, DEFENDANT–RESPONDENT.

Argued December 1, 2009—Decided June 29, 2010.

Albin, J., filed a dissenting opinion joined by Rivera–Soto, J.

18

*Jeanne Screen,* Deputy Attorney General, argued the cause for appellant (*Anne Milgram,* Attorney General of New Jersey, attorney).

*Michael B. Jones,* Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Justice WALLACE, JR., delivered the opinion of the Court.

In this case, we must determine whether the police had reasonable suspicion to subject defendant to an investigatory detention, and if so, whether the resultant search was conducted in a reasonable manner. The trial court denied defendant's motion to suppress the evidence seized from his person. On appeal, the Appellate Division reversed, concluding that because the anonymous tip of a man with a gun was not corroborated, an investigatory stop was not justified. We granted the State's Petition for Certification. 200 *N.J.* 208, 976 *A.*2d 385 (2009). We now affirm, but for different reasons. We hold that the totality of the circumstances justified an investigatory stop, but that because the search was not limited in scope to an intrusion reasonably designed to protect the officer and to discover a weapon, the fruits of the search must be suppressed.

## I.

A Union County Grand Jury indicted defendant, Tysen Privott, for third-degree possession of cocaine, *N.J.S.A.* 2C:35–10(a)(1), third-degree possession of cocaine with intent to distribute, *N.J.S.A.* 2C:35–7.1, and second-degree possession with intent to distribute cocaine within 500 feet of a public park, *N.J.S.A.* 2C:35–5(a)(1). Defendant filed a motion to suppress the drugs seized from his person at the time of his arrest.

At the suppression hearing, Officer Jeffrey Plum was the sole witness on behalf of the State. Plum testified that at the time of the incident, he was a thirteen-year veteran of the Plainfield Police Department, and was assigned to the Street Crimes Unit. On May 13, 2003, Plum was on routine patrol with his partner, when at 6:08 p.m., he received a radio dispatch from police headquarters

that an anonymous caller reported a man with a handgun at the corner of Plainfield Avenue and West Third Street.

The caller described the individual as a tall, thin, dark-skinned male wearing a black jacket and a black and red cap. Plum was nearby and arrived at the location soon after receiving the dispatch. He saw three men standing at the corner, one of whom was wearing a red jacket and a black and red cap. Plum noticed that except for the color of his jacket, the man, later identified as defendant, matched the physical description relayed by the dispatcher. Defendant's jacket was open, and he wore a long white tee-shirt that hung well below his jacket.

Plum recognized defendant from prior narcotics investigations. He recalled that he had previously arrested defendant for drug charges. Plum testified that although he had never known defendant to carry a weapon, it was common for guns to be found in connection with narcotics offenses and that he had discovered a weapon in over twenty prior drug arrests.

Plum stated that he had participated in roughly ten of the numerous arrests the police made in the area where defendant was spotted, which was known for gang violence. He was aware that defendant lived in that immediate area and associated with a group of persons known by the names of "Cash Money," "Projects," "Lib Side," "C.M.B.," or "314 Lib Side." Plum claimed the police were receiving information almost daily regarding incidents concerning both handguns and shootings that involved the same group.

Upon seeing Plum's police car approach the corner, defendant and the two men began to walk away. Plum noticed that defendant appeared quite nervous and observed him move his hand towards his waistband as he was turning away. Based on both defendant's conduct and the fact that he partially matched the anonymous caller's description of a man with a gun, Plum believed that defendant might have a weapon concealed in his waistband. Plum drove to the sidewalk, exited his patrol car, and directed defendant to stop and place his hands against a chain-link fence.

Defendant cooperated. Plum then lifted defendant's tee-shirt and observed the top of a plastic bag protruding roughly two inches from his waistband. Plum removed the bag that contained what he suspected to be crack cocaine.

On cross examination, Plum acknowledged that defendant was wearing a red jacket and that his tee-shirt hung at least six inches below his waist. When asked whether defendant had actually grabbed the bottom of his tee-shirt, Plum replied that he did not allow him that much time, and because defendant was making a motion towards his waist, he had defendant place his hands on the fence before he lifted defendant's shirt to visualize the waistband area.

Defendant testified. He stated that he was walking on Third Street when he saw a police car approach. He was wearing a red coat and a red, black, and white fitted hat. He said he wore a white tee-shirt similar to the one he was wearing on the stand, that hung underneath his jacket. Defendant denied that he made any motion with his hand to lift his tee-shirt. He said that the police officer put him against the fence, patted him up and down, came back to his waist, and lifted his shirt.

In denying the motion to suppress, the trial court credited the officer's account of the incident and stated in part:

The [c]ourt finds that ... although the officer's observations did not conform completely, in that the defendant had a red jacket on, the [c]ourt believed that the officer had reasonable suspicion to conduct an investigation stop. And seeing the furtive gesture towards the very area where the informant said that the weapon was located, the officer had an obligation to make an observation of the waistband area, which he did. And the [c]ourt finds that the officer's actions are appropriate.

At trial, a jury found defendant guilty of third-degree possession of cocaine and not guilty of the two counts of possession with intent to distribute. The trial court imposed a five-year prison sentence with a two-year period of parole ineligibility.

On appeal, in an unpublished opinion, the Appellate Division reversed defendant's conviction on the ground that the trial court erred in denying defendant's motion to suppress. The panel found the anonymous tip to be substantially inaccurate, based upon the

fact that the tip referred to a man wearing a black jacket with a gun, whereas "[d]efendant was wearing a red jacket and was not in possession of a gun." Additionally, the panel found no support in the record for the trial court's finding that the anonymous caller said that the weapon was located in the waistband. Citing *Florida v. J.L.*, 529 *U.S.* 266, 120 *S.Ct.* 1375, 146 *L.Ed.*2d 254 (2000), the panel concluded that the anonymous tip reporting a man with a gun, without sufficient indicia of reliability, did not support a valid stop and frisk. The panel reasoned that defendant's acts of walking away and reaching inside his jacket were "consistent with innocent conduct and [did] not, standing alone, constitute a basis for an articulable suspicion of criminal conduct or otherwise corroborate an 'anonymous tip' justifying a 'stop and frisk.'"

We granted the State's Petition for Certification. 200 *N.J.* 208, 976 *A.*2d 385 (2009).

## II.

The State contends that the totality of the circumstances supports the trial court's finding that the police had reasonable and articulable suspicion that defendant was engaged in criminal activity to justify an investigatory stop and a limited protective search for weapons. The State notes that this case, unlike *J.L.*, *supra*, involved far more than an anonymous tip reporting a person with a gun and a man matching the description given at the location provided. Further, the State argues that the officer's act of lifting defendant's shirt to view the exterior of the waistband of his pants was within the permissible scope of a protective search for weapons.

In contrast, defendant argues that the anonymous tip, coupled with the other mentioned circumstances, were not sufficient to justify a stop and frisk. In addition, defendant contends that the officer's conduct in lifting defendant's shirt, rather than performing a standard pat-down search, was improper, and an unreasonable expansion of the scope of the search.

## III.

### A.

The Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution protect citizens against unreasonable searches and seizures. *U.S. Const.* amend. IV; *N.J. Const.* art. I, ¶ 7. For a search to be deemed constitutional, a warrant is required based "upon probable cause 'unless [the search] falls within one of the few well-delineated exceptions to the warrant requirement.'" *State v. Maryland,* 167 *N.J.* 471, 482, 771 *A.*2d 1220 (2001) (alteration in original) (citations omitted). "The probable-cause requirement is the constitutionally-prescribed standard for distinguishing unreasonable searches from those that can be tolerated in a free society[.]" *State v. Novembrino,* 105 *N.J.* 95, 106, 519 *A.*2d 820 (1987).

Beyond satisfying the probable cause standard, there are additional constitutionally permissible forms of police encounters that do not constitute searches or seizures for purposes of the warrant requirement. *Maryland, supra,* 167 *N.J.* at 483, 771 *A.*2d 1220. One such encounter is a field inquiry. The police do not violate a citizen's rights " 'by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.'" *Ibid.* (quoting *Florida v. Royer,* 460 *U.S.* 491, 497–98, 103 *S.Ct.* 1319, 1324, 75 *L.Ed.*2d 229, 236 (1983) (citations omitted)). However, the individual approached "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Ibid.* (internal quotation marks and citation omitted); *see also State v. Sheffield,* 62 *N.J.* 441, 447, 303 *A.*2d 68 (1973) ("[M]ere field interrogation, without more, by a police officer does not involve 'detention' in the constitutional sense so long as the officer does not deny the individual the right to move.").

Another type of encounter, and the one we are concerned with in this case, is an investigatory stop, sometimes referred to as a *"Terry* [1] *"* stop or a "stop and frisk." In *Terry, supra,* an experienced police officer observed three men looking into a store and suspected they were preparing to commit a robbery. 392 *U.S.* at 5–6, 88 *S.Ct.* at 1871–72, 20 *L.Ed.*2d at 896–97. The officer approached the men "and asked their names." *Id.* at 6–7, 88 *S.Ct.* at 1872, 20 *L.Ed.*2d at 897. After receiving a mumbled reply, the officer conducted a pat-down search of the men and found two weapons. *Id.* at 7, 88 *S.Ct.* at 1872, 20 *L.Ed.*2d at 897. In evaluating the constitutionality of the officer's actions, the United States Supreme Court authorized such conduct when the police officer could "point to specific articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906. Further, the *Terry* Court recognized "a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual[.]" *Id.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909.

In *Adams v. Williams,* the Court explained that "[t]he purpose of th[e] limited [weapons] search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence[.]" 407 *U.S.* 143, 146, 92 *S.Ct.* 1921, 1923, 32 *L.Ed.*2d 612, 617 (1972). The search must "be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry, supra,* 392 *U.S.* at 29, 88 *S.Ct.* at 1884, 20 *L.Ed.*2d at 911.

 Our Court has emphasized that in determining the lawfulness of an investigatory stop, a reviewing court must "evaluate the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted

---

[1] *Terry v. Ohio,* 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968).

and/or overbearing police intrusions." *State v. Davis,* 104 *N.J.* 490, 504, 517 *A.*2d 859 (1986). Indeed, "[a]lthough a stop in a high-crime area does not by itself justify a *Terry* frisk, the location of the investigatory stop can reasonably elevate a police officer's suspicion that a suspect is armed." *State v. Valentine,* 134 *N.J.* 536, 547, 636 *A.*2d 505 (1994) (internal citation omitted). That is, when a police officer has a "specific and particularized basis for an *objectively* reasonable suspicion that defendant was armed and dangerous[,]" *State v. Roach,* 172 *N.J.* 19, 27, 796 *A.*2d 214 (2002) (citation and internal quotation marks omitted) (emphasis added in original), the officer may "conduct a carefully limited search of the outer clothing of such person [ ] in an attempt to discover weapons which might be used to assault him." *Terry, supra,* 392 *U.S.* at 30, 88 *S.Ct.* at 1885, 20 *L.Ed.*2d at 911.

In determining the lawfulness of a protective search, we have explained that "courts have upheld seizures of unidentifiable objects on a suspect's person where a lawful pat-down is either inconclusive or impossible." *Roach, supra,* 172 *N.J.* at 28, 796 *A.*2d 214. "The reasoning in such cases is that the officer's safety is paramount and that the officer is justified in taking further steps if necessary to protect his safety[.]" *Ibid.*

■ When an anonymous tip is involved, additional factors must be considered to generate the requisite level of reasonable and articulable suspicion. *Alabama v. White,* 496 *U.S.* 325, 329, 110 *S.Ct.* 2412, 2415–16, 110 *L.Ed.*2d 301, 308 (1990). In such cases, the tipster's veracity, reliability, and basis of knowledge are "relevant in determining the value of his report." *Id.* at 328, 110 *S.Ct.* at 2415, 110 *L.Ed.*2d at 308 (citations and internal quotation marks omitted). The police must verify that the tip is reliable by some independent corroborative effort. *Id.* at 329–30, 110 *S.Ct.* at 2416, 110 *L.Ed.*2d at 308.

In *J.L., supra,* the United States Supreme Court held that an anonymous tip of criminal activity, standing alone, is not sufficient to establish a reasonable articulable suspicion of criminal activity. 529 *U.S.* at 271, 120 *S.Ct.* at 1379, 146 *L.Ed.*2d at 260. In *J.L.,*

*supra,* an anonymous caller reported to the police that a young black male, armed with a gun, "wearing a plaid shirt" was located at a bus stop. *Id.* at 268, 120 *S.Ct.* at 1377, 146 *L.Ed.*2d at 258–59. The police responded to the scene and observed the defendant wearing a plaid shirt with two other males. *Id.* at 268, 120 *S.Ct.* at 1377, 146 *L.Ed.*2d at 259. One of the officers approached the defendant, patted him down, and seized a gun from his pocket. *Ibid.* In concluding that the anonymous call was not sufficient to justify a *Terry* frisk, the Court explained:

> The anonymous call concerning [defendant] provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting [defendant] of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [defendant].
> [*Id.* at 271, 120 *S.Ct.* at 1379, 146 *L.Ed.*2d at 260–61.]

Further, the Court rejected the government's argument that the tip was reliable because it accurately described the defendant, stating:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality[.]
> [*Id.* at 272, 120 *S.Ct.* at 1379, 146 *L.Ed.*2d at 261.]

In the wake of *J.L.,* we reached a similar conclusion in *State v. Rodriguez,* 172 *N.J.* 117, 796 *A.*2d 857 (2002). In *Rodriguez, supra,* the police received an anonymous tip that two men, a "thin, Hispanic male, about five feet, ten inches tall, wearing white shorts, a white tee shirt, and gold-rimmed glasses[,]" and "a white, heavyset male six feet tall with a receding hairline and mustache, wearing a black tank top and dark shorts[,]" left Ocean City by bus traveling to Philadelphia to purchase drugs and would return through Atlantic City. *Id.* at 121–22, 796 *A.*2d 857. The police began surveillance of all buses arriving in Atlantic City from Philadelphia and late in the afternoon observed two men exit a bus

who fit the description. *Id.* at 122, 796 *A.*2d 857. The police approached the men and asked "if they would agree to talk to them." *Ibid.* The men agreed, and they walked to the patrol office in the terminal. *Ibid.* "Once inside the patrol office[,] the police separated the two men[,]" and ultimately obtained defendant's consent to search both his person and his bag. *Id.* at 123–24, 796 *A.*2d 857. The search revealed drugs and the defendant was arrested. *Id.* at 124, 796 *A.*2d 857. The defendant's motion to suppress was denied and the Appellate Division affirmed. *Id.* at 124–25, 796 *A.*2d 857. In reversing, we stated:

> The informant accurately described the appearance of defendant and Forte, and correctly predicted their location at the bus terminal. We cannot reasonably conclude, based on those benign elements of the informant's tip, that the tip itself was "reliable in its assertion of illegality[.]" *Ibid.* In respect of that aspect of the tip most critical to the analysis, namely, that defendant would be engaged in drug trafficking, the informant provided no explanation of how or why he arrived at that conclusion. In fact, the only portion of the tip corroborated by the officers pertained to the innocent details of defendant's appearance at the bus terminal. Without more, the tip is insufficient to justify the detention under *Terry* and our analogous case law.
>
> [*Id.* at 131, 796 *A.*2d 857 (alteration in original).]

## B.

We turn now to apply those principles to the case at hand. Initially, we must determine whether, under the totality of circumstances, there was a specific and articularized basis to support an investigatory stop of defendant. As noted previously, the Appellate Division concluded that the anonymous tip, standing alone, was not enough.

Here, the relevant circumstances extend well-beyond an isolated anonymous tip of a man with a gun at a particular location. As the officer approached and made eye contact with defendant, who partially matched the description given by the anonymous informant, the officer recognized defendant from prior narcotic arrests. The officer also knew that defendant was associated with violent gangs that were responsible for recent shootings in the area. *See Valentine, supra,* 134 *N.J.* at 547, 636 *A.*2d 505 (noting location of

stop and "police officer's knowledge of suspect's criminal history" are relevant factors in assessing *Terry* stop and frisk). Defendant appeared nervous, walked away from the officer, and moved one hand towards his waistband. From his extensive experience in the field, the officer was aware that the waistband is an area commonly used by armed persons to conceal a weapon. Based on the totality of the circumstances, we conclude that there were specific and particularized reasons for the officer to conduct an investigatory stop.

## C.

Next we must determine whether there was a sufficient justification for a frisk of defendant, and if so, was the conduct of the search performed by the officer reasonable. In order to provide for the safety of the police officer, the *Terry* Court approved a carefully limited search of the outer clothing to discover weapons that might be used to harm the officer. *Terry, supra,* 392 *U.S.* at 30, 88 *S.Ct.* at 1885, 20 *L.Ed.*2d at 911. The *Terry* Court explained that "there is no ready test for determining reasonableness other than by balancing the need to search or seize against the invasion which the search or seizure entails." *Id.* at 21, 88 *S.Ct.* at 1879, 20 *L.Ed.*2d at 905 (internal quotation marks, citation, and alteration in original omitted). They emphasized that although a frisk for weapons "constitutes a severe, though brief, intrusion upon cherished personal security," such a frisk is reasonable when weighed against "the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." *Id.* at 24–25, 88 *S.Ct.* at 1882, 20 *L.Ed.*2d at 907–08. The *Terry* Court authorized a limited pat-down for weapons where a reasonably prudent officer would be justified in the belief, based on "specific and articulable facts[,]" *id.* at 21, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906, and not "his inchoate and unparticularized suspicion or 'hunch,'" *id.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909, that the person is armed and dangerous. *Id.* at 27, 88 *S.Ct.* at 1883, 20

*L.Ed.*2d at 909. Thus, the Court permitted an intrusion that was no more than necessary to protect the officer from harm. *Ibid.*

In a later decision, the United States Supreme Court explained that *Terry* established

an exception to the requirement of probable cause, an exception whose "narrow scope" this Court "has been careful to maintain." Under that doctrine a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted. Nothing in *Terry* can be understood to allow a generalized "cursory search for weapons" or, indeed, any search whatever for anything but weapons.

[*Ybarra v. Illinois,* 444 *U.S.* 85, 93–94, 100 *S.Ct.* 338, 343, 62 *L.Ed.*2d 238, 247 (1979) (footnote and internal citation omitted).]

We apply an objective test in determining whether, under the totality of the circumstances, a police officer's actions in conducting a *Terry* frisk are reasonable. *State v. Arthur,* 149 *N.J.* 1, 7–8, 691 *A.*2d 808 (1997). To be sure, "[v]arious circumstances may give rise to an objectively reasonable suspicion that a suspect is armed and dangerous." *State v. Thomas,* 110 *N.J.* 673, 679, 542 *A.*2d 912 (1988). Indeed, the same conduct that justifies an investigatory stop may also present the officer with a specific and particularized reason to believe that the suspect is armed. *Id.* at 679–80, 542 *A.*2d 912. That is the situation presented here.

Specifically, when defendant walked away and placed his hands near his waistband, a reasonable officer with the background knowledge of the conditions in that area, and who had received an anonymous tip of a man with a gun, would have an objectively reasonable concern for his or her safety. Thus, we conclude that the totality of circumstances justified the officer's decision to frisk defendant.

Based upon our determination that the officer's decision to frisk the defendant was valid, we must now assess whether the scope of the search conducted by the officer was reasonable. The State contends that the officer's act of lifting defendant's shirt to visualize his waistband was a reasonable means likely to be effective in determining whether defendant was carrying a gun. Although the State agrees that, generally, a *Terry* protective

search takes the form of a pat-down or pat-frisk of the exterior clothing, it asserts that in this case the officer's conduct of lifting defendant's shirt was reasonable.

 We start with the principle that "the investigative methods employed [in a *Terry* stop] should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer, supra,* 460 *U.S.* at 500, 103 *S.Ct.* at 1325–26, 75 *L.Ed.*2d at 238. Further, "[i]t is the State's burden to demonstrate that the seizure [and frisk] it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Id.* at 500, 103 *S.Ct.* at 1326, 75 *L.Ed.*2d at 238.

In assessing the scope of the search by the officer, the evidence is clear that defendant was cooperative at all times. When stopped, defendant placed his hands against a fence as instructed by the officer. A reasonable search, as well as the least intrusive maneuver needed to protect the safety of the officer against a possible weapon, would have been the traditional pat-down search of defendant's outer clothing. That did not occur. Rather, the police officer lifted defendant's tee-shirt to expose defendant's stomach, and in doing so, observed a plastic bag with suspected drugs in the waistband of defendant's pants. That maneuver exceeded the scope of the pat-down search needed to protect the officer against defendant having a weapon and was akin to a generalized cursory search of defendant that is not condoned. *See generally, State v. Smith,* 155 *N.J.* 83, 91, 713 *A.*2d 1033 (1998) (noting "protective search does not entail a general search of the person for evidence of crime; rather it is 'designed to discover weapons that could be used to assault the officer.' ") (citation omitted), *cert. denied,* 525 *U.S.* 1033, 119 *S.Ct.* 576, 142 *L.Ed.*2d 480 (1998).

This is not a case like *Roach, supra,* in which the officer felt a bulge, but could not determine what it was, and the defendant refused to obey the orders of the police and continued to move his hands towards the unidentified bulge. 172 *N.J.* at 29, 796 *A.*2d

214. Under those circumstances, we found "an objectively reasonable concern for the officers' safety" to validate the officer's removal of the object. *Ibid.* Nor is this case like *Valentine, supra,* in which the officer first conducted a lawful pat-down and upon feeling a hard object, removed it to discover a weapon. 134 *N.J.* at 540, 636 *A.*2d 505.

As we have often "stated, the facts surrounding the event are pivotal." [2] *Roach, supra,* 172 *N.J.* at 29, 796 *A.*2d 214. Our jurisprudence attempts to strike a balance between the competing interests of an individual's right to privacy and the need to protect the police from persons with weapons. In this case, we strike that balance in favor of the traditional pat-down search. We conclude that the officer's conduct in lifting defendant's shirt exceeded the reasonable intrusion that we permit as part of a *Terry* stop.

### IV.

We affirm the judgment of the Appellate Division, but for different reasons.

---

[2] The present case is factually different from those cases relied on by the dissent. We do not hold that a *Terry* frisk permits only a limited pat-down search. For example, in *Adams, supra,* a person known to a policeman said that a man seated in a nearby vehicle had a gun concealed in his waist and carried narcotics. 407 *U.S.* at 144, 92 *S.Ct.* at 1922, 32 *L.Ed.*2d at 616. The policeman walked to the vehicle and instructed the suspect to open the door. *Id.* at 145, 92 *S.Ct.* at 1922-3, 32 *L.Ed.*2d at 616. When the suspect rolled down the window instead, the policeman reached into the car and removed a loaded revolver from the suspect's waistband. *Ibid.* The Supreme Court found that when the suspect

> rolled down his window, rather than complying with the policeman's request to step out of the car so that his movements could more easily be seen, the revolver allegedly at [the suspect's] waist became an even greater threat. Under these circumstances the policeman's action in reaching to the spot where the gun was thought to be hidden constituted a limited intrusion designed to insure his safety, and we conclude that it was reasonable. [*Id.* at 148, 92 *S.Ct.* at 1924, 32 *L.Ed.*2d at 618.]

Thus, under certain circumstances searches beyond a pat-down frisk may be reasonable to insure the safety of the policeman. Such is not the case here, where the suspect was cooperative, and, as instructed, placed his hands on a fence when the policeman conducted the search.

Justice ALBIN, dissenting.

I agree with the majority that, under the totality of the circumstances, the police officer dispatched to investigate the report of a man with a gun was constitutionally authorized to conduct an investigatory stop of defendant. I do not agree with the majority that the officer confronting defendant, who he *reasonably* believed was concealing a gun in his waistband, violated either the Fourth Amendment to the United States Constitution or Article 1, Paragraph 7 of the New Jersey Constitution by lifting defendant's shirt. The federal and state constitutions prohibit only "unreasonable searches and seizures." *U.S. Const.* amend. IV; *N.J. Const.* art. 1, ¶ 7. I cannot conclude that the officer—making a split-second decision in a fast-moving and dangerous encounter—exceeded the scope of a reasonable search by lifting defendant's shirt to reveal and gain control of a gun that might have been concealed and used to kill him. For that reason, I respectfully dissent from the majority's determination that defendant was subjected to an unconstitutional search.

## I.

On May 13, 2003, at approximately 6:00 p.m., Officer Jeffrey Plum was dispatched to the corner of Plainfield Avenue and Third Street on the basis of an anonymous tip reporting a man with a gun. The officer arrived at the scene almost immediately after the dispatch and observed a man—defendant—generally fitting the description contained in the tip. The officer pulled his patrol car "right up onto the sidewalk," next to where defendant stood with two companions. The officer knew defendant from prior narcotics investigations and arrests and also knew defendant to be "associated" with a local gang. Defendant was wearing a jacket over a long shirt. Defendant appeared nervous, turned away, and placed his hand to his waistband. From his experience, the officer was aware that suspects hide weapons in their waistbands, and he believed that defendant was hiding a gun there. The officer exited the patrol car, approached defendant, and had him place his

hands on a nearby fence. The officer then lifted defendant's shirt in the immediate area of his waistband where a gun might be concealed. The search uncovered drugs instead.

## II.

Our constitutional jurisprudence does not require a police officer to place his life in peril by conducting a pat-down, rather than lifting a shirt, when he has a reasonable and articulable belief that a gun is hidden in a suspect's waistband. *Terry v. Ohio*, 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968), does not set down a bright-line rule that an officer must mechanically proceed with a pat-down when the officer reasonably believes the suspect has secreted a weapon in a precise location on his body. *Terry* generally holds that

> [w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.
>
> [*Id.* at 24, 88 *S.Ct.* at 1881, 20 *L.Ed.*2d at 908.]

It is important to remember the facts of *Terry*. In that case, a police officer approached three men whom he suspected were about to commit a crime—the "stick-up" of a store. *Id.* at 6–7, 88 *S.Ct.* at 1872, 20 *L.Ed.*2d at 897. The officer reasonably believed that the suspects might be armed, although he did not know precisely where on their bodies weapons might be concealed. *Id.* at 28, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 910. In those circumstances, the United States Supreme Court upheld a frisk of the outer clothing of the suspects to search for potential weapons. *Id.* at 30, 88 *S.Ct.* at 1884–85, 20 *L.Ed.*2d at 911.

In *Adams v. Williams*, 407 *U.S.* 143, 92 *S.Ct.* 1921, 32 *L.Ed.*2d 612 (1972), however, the Supreme Court did not limit a *Terry* search to a pat-down. There, the Court found that, based on a known informant's tip, a police officer properly conducted a protective search for a weapon reported to be concealed in the waistband of a suspect sitting in a car. *Id.* at 144–48, 92 *S.Ct.* at

1922–24, 32 *L.Ed.*2d at 616–18. In upholding the search, the Court concluded that the Fourth Amendment did not bar "the policeman's action in reaching to the spot where the gun was thought to be hidden"—the suspect's waistband—because the "limited intrusion [was] designed to insure [the officer's] safety." *Id.* at 145, 148, 92 *S.Ct.* at 1923, 1924, 32 *L.Ed.*2d at 616, 618.

*Terry* and *Adams* are perfectly compatible. The officer in *Terry* had a reasonable and articulable suspicion that the suspects might have weapons concealed *somewhere* on their bodies, thus the justification for a pat-down. The officer in *Adams* had a reasonable and articulable suspicion that a weapon was hidden in a *specific* location on the suspect's body, thus the justification for a more targeted but limited search.

Courts have recognized that there are circumstances when requiring a police officer "to conduct a pat-down before taking obviously required action to protect his own life would be contrary to every dictate of reason." *People v. Superior Court (Holmes),* 15 *Cal.App.*3d 806, 94 *Cal.Rptr.* 728, 730 (1971). The Constitution does not demand that police officers recklessly place their lives at risk. *See* 4 Wayne R. LaFave, *Search and Seizure* § 9.6(b), at 657 (4th ed. 2004) (noting that "situations arise on occasion in which it would be foolhardy for the officer to do anything short of an immediate search"). To mandate a pat-down first, in circumstances such as here, may delay a police officer from immediately gaining access to a gun stashed in a waistband that might be used against him.

A number of jurisdictions have upheld a protective search, similar to the one in this case, as a reasonable measure to ensure a police officer's safety. *See, e.g., United States v. Reyes,* 349 *F.*3d 219, 224–25 (5th Cir.2003) (finding officer's request that defendant empty his pockets and lift his shirt was permissible under *Terry* ), *cert. denied,* 540 *U.S.* 1228, 124 *S.Ct.* 1528, 158 *L.Ed.*2d 170 (2004); *United States v. Hill,* 545 *F.*2d 1191, 1193 (9th Cir.1976) (lifting of defendant's shirt was "reasonably designed to discover instruments of assault"); *United States v. Edmonds,* 948 *F.Supp.* 562,

566–67 (E.D.Va.1996) (asking defendant to raise his loosely-fitting shirt and then reaching over and lifting his shirt "were both the functional equivalent of a permissible 'frisk' under *Terry* and its progeny"), *aff'd,* 149 *F.*3d 1171 (4th Cir.1998), *cert. denied,* 525 *U.S.* 912, 119 *S.Ct.* 257, 142 *L.Ed.*2d 212 (1998); *United States v. Terry,* 718 *F.Supp.* 1181, 1187 (S.D.N.Y.1989) ("While general exploratory searches are precluded, any reasonably limited intrusion that is designed to uncover instruments of assault is allowed, including reaching into a suspect's coat pocket and lifting a suspect's shirt."), *aff'd,* 927 *F.*2d 593 (2d Cir.1991); *In re Jakiyo,* 256 *A.D.*2d 466, 682 *N.Y.S.*2d 399, 401 (1998) ("[W]hen the appellant turned around and reached for his waistband, the arresting officer—mindful of his own safety and that of the public—acted appropriately by raising the appellant's shirt in the waistband area, inasmuch as it is common knowledge . . . that a handgun is often carried in the waistband." (citation and internal quotation marks omitted)).

Courts should not look at the uncertain events facing the officer in the street through the distorting lens of hindsight. Rather, courts must give "due weight" not only to the dangerous circumstances presented to the officer, but also to inferences the officer could reasonably draw from those facts "in light of his experience." *Terry, supra,* 392 *U.S.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909. Here, the officer—who rapidly responded to a dispatch, identified defendant as the suspected man with a gun, and went to further investigate—was not "required to proceed in the coldly logical sequence which may suggest itself after the event." *People v. Atmore,* 13 *Cal.App.*3d 244, 91 *Cal.Rptr.* 311, 314 (1970).

In short, when there is a reasonable and articulable belief that a suspect is armed with a weapon concealed in a precise location on the suspect's body, neither the federal nor state constitution imposes an inflexible regime of a pat-down first when doing so will jeopardize the life of a police officer. Only "unreasonable searches" are prohibited. *U.S. Const.* amend. IV; *N.J. Const.* art. 1, ¶ 7. Here, the police officer reasonably believed that lifting

defendant's shirt—not a pat-down—was the best means of gaining control of a gun that might be hidden in defendant's waistband. It cannot be that the law imposes a duty on a police officer to investigate a man with a gun, *see State v. Stovall,* 170 *N.J.* 346, 363, 788 *A.*2d 746 (2002), and, at the same time, the Constitution forbids him from taking reasonable measures to protect his life.

Because I cannot conclude that the officer in this case conducted an unreasonable search, I must respectfully dissent.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, WALLACE, and HOENS—5.

*For reversal*—Justices ALBIN and RIVERA-SOTO—2.