**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4138-24

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MAURICE D. ROSS,

     Defendant-Appellant.

_____

        Argued February 3, 2026 – Decided March 4, 2026

        Before Judges Gooden Brown, Rose and DeAlmeida.

        On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Essex County, Indictment Nos. 23-03-0533 and 23-03-0534.

        Ashley Brooks, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Ashley Brooks, of counsel and on the briefs).

        Matthew E. Hanley, Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens, II, Essex County Prosecutor, attorney; Matthew E. Hanley, of counsel and on the brief).

PER CURIAM

By leave granted, defendant Maurice D. Ross appeals from a July 1, 2025 Law Division order denying his motion to suppress a .45 caliber handgun seized during a protective frisk conducted by a special law enforcement officer (SLEO)[1] on Newark Housing Authority (NHA) property just before midnight, on May 14, 2022. In a written decision accompanying the order, the motion court rejected defendant's argument that the body worn camera (BWC) statutes, N.J.S.A. 40A:14-118.3 to -118.5, read in pari materia with the SLEO Act, N.J.S.A. 40A:14-146.8 to -146.18, and the Attorney General BWC Policy[2] entitled defendant to the mandatory rebuttable presumption – that "exculpatory evidence was destroyed or not captured in [his] favor" under N.J.S.A. 40A:14-

_____

[1]  SLEOs are also referenced in the record as "special police officers" and "SPOs."

[2]  In his April 17, 2025 supplemental submission to the motion court, defendant provided Attorney General Directive 2021-5, issued with the May 2021 BWC Policy, and the court cited that version of the BWC policy in its decision. See Off. of the Att'y Gen., Law Enf't Directive No. 2021-5, Directive Revising Policy Regarding Use of Body Worn Cameras (BWCs) and Stored BWC Recordings (May 25, 2021). However, at the time of the incident, Attorney General Directive 2022-1, issued with the January 2022 BWC Policy, was in effect. See Off. of the Att'y Gen., Law Enf't Directive No. 2022-1, Update to Body Worn Camera Policy (Jan. 19, 2022). Accordingly, we cite the applicable sections of the May 2021 BWC Policy as those sections do not differ from the January 2022 BWC Policy. In doing so, we use Attorney General Guidelines and BWC Policy interchangeably.

118.5(q)(2) – because the SLEO did not activate a BWC at the time of the stop and frisk. The court concluded the handgun at issue was lawfully seized from defendant's waistband.

On appeal, defendant reprises the same arguments raised before the motion court:

POINT I

THE [MOTION] COURT ERRED IN FINDING THAT THE BWC STATUTE DID NOT APPLY TO THE SLEO. THIS COURT SHOULD EITHER ORDER SUPPRESSION OR REMAND FOR ANOTHER HEARING TO APPLY THE BWC STATUTE.

A. SLEOs Are Subject to the Requirements of the BWC Statutes.

B. This Court Should Order Suppression. Or at the Very Least, It Should Remand for a New Suppression Hearing Before a New Judge.

We reject these contentions and affirm.

I.

We summarize the pertinent facts and events from the motion record. Following his arrest, defendant was charged in two related Essex County indictments with second-degree unlawful possession of a handgun, N.J.S.A.

A-4138-24

2C:39-5(b), and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1). Defendant thereafter filed the present motion.[3]

During the two-day testimonial hearing, the State presented the testimony of SLEO Benjamin Mauriello and NHA Assistant Director Michael Grainger. The State also moved into evidence footage of the BWC worn by Officer Santiago[4] of the Newark Police Department (NPD), who responded to the scene after defendant was arrested, but did not testify. Defendant did not take the stand or present any evidence.

At the time of the hearing, Mauriello was an SLEO for nearly sixteen years. He explained SLEOs receive the same "full training as any other police officer in the State of New Jersey," but after graduation from the police academy SLEOs must "find [their] own work."

Employed by the NHA since 2018, Mauriello handles "[a]nything that happens criminally on [NHA] property . . . from tickets to domestic violence."

---

[3] In his notice of motion and certification in support of the motion, defense counsel stated police seized a ".45 caliber revolver and [five] .410 gauge shotgun shells." In its decision on the motion, the court found "Mauriello seized a black .45 caliber handgun loaded with [five] .410 caliber shells from [d]efendant." Although there is no information about the shells in the record provided on appeal, seizure of the ammunition is not pertinent to the issues raised before us.

[4] Santiago's first name is not included in the record provided on appeal.

Mauriello testified he was trained by the NPD, which issued his service weapon and radio, but he purchased his own "[u]niforms, body armor, boots, [and] duty rig." Mauriello further stated the NPD did not issue BWCs to SLEOs.

When questioned whether the NPD provided BWC training, Mauriello stated he could not recall the date, but sometime in 2022,[5] the NPD administered "a test" to SLEOs. He said SLEOs "were supposed to get [BWCs], but [they] never got them."

Mauriello testified he purchased his own BWC while working for the Newark Board of Education before he was employed by the NHA. Mauriello continued: "And I purchased my own" because "you're dealing with a lot of kids and stuff like that, so I just wanted to have my own. Before -- it was before [the NPD] even had body cams."

Mauriello stated he has activated his personal BWC during his employment with the NHA, but "not often." He typically activates the BWC when he believes "a situation is going to become hairy." He retains the footage in "important" circumstances, such as "shootings" and "domestic violence[]" incidents.

---

[5] Mauriello was not asked whether the training occurred before or after the May 14, 2022 incident date.

A-4138-24

Santiago's BWC footage depicted Mauriello in uniform wearing a BWC at the time of the May 14, 2022 incident. Noting the light on his BWC was not "flickering" in the video footage, Mauriello confirmed he did not activate his BWC during the incident. When asked why he did not do so, Mauriello explained: "Everything happened so fast, I just didn't really think about it, you know."

On cross-examination, Mauriello acknowledged, in his incident report, he did not indicate he was wearing a BWC. But he testified, at the bottom of the report, he noted: "No body worn camera assigned to SPO Mauriello." Mauriello explained, "That's what we -- I do on every report because we are not assigned body cams, so . . . when regular officers are assigned body cams, . . . they put it in [their reports] that it is body cam worn [sic]."

Turning to the circumstances leading to defendant's arrest, Mauriello testified the day before the incident, he and Grainger reported to a vacant NHA complex following "complaints of narcotics sales and trespassing." Mauriello and Grainger performed "verticals," which entailed ascending and descending the stairs "to make sure there's nobody inside the buildings." Upon entering one of the buildings, Mauriello and Grainger "encountered two individuals." "Grainger[] told them to leave, they were trespassing, and they could be

6

arrested." Both individuals left the premises and the interaction was not documented.

The following day, on May 14, 2022, Mauriello and Grainger returned and found the same individuals inside the same building. Mauriello testified he and Grainger sat the men down with the plan to issue summonses for trespassing in light of Grainger's warning the previous day. While the men were sitting, "[defendant] was fidgeting by his waistband . . . with his hand." In response, Mauriello "took his hand away and . . . felt the butt of a gun." Defendant was arrested and the other man was released on a summons for trespassing.[6] On cross-examination, Mauriello acknowledged he did not "give any instructions to [defendant] before physically moving his hand away."

Grainger testified as an NHA supervisor, he oversaw the "general duties" of SLEOs employed by the NHA, but the NPD supervised their "policing functions" and reviewed their reports. When asked whether he knew the "classification level" for SLEOs, Grainger stated, "I believe their level is a two." He further acknowledged that classification "appl[ied] across the board for [SLEOs]."

---

[6] The other individual is not a party to this appeal.

A-4138-24

At the time of the hearing, Grainger was employed by the NHA for six years and previously worked as an NPD officer for twenty-six years. His account of the May 13 and 14 encounters with defendant and his cohort generally tracked Mauriello's testimony. Grainger further explained, on May 14, he followed Mauriello into the building and Mauriello "immediately addressed two individuals that were standing in the corner near the staircase." Grainger recognized defendant and the other man from the previous night and stated, "they needed to be locked up for trespassing."

Grainger testified Mauriello stayed with the men and asked for their identification while Grainger went upstairs. When questioned by the court, Grainger explained while descending the stairs, he heard Mauriello say, "[s]top reaching, stop reaching," but Grainger did not observe defendant's movements. Grainger stated Mauriello approached defendant, and said, "[o]h, you got a gun?" Mauriello arrested defendant and called for backup.

In a cogent written decision accompanying the July 1, 2025 order, the motion court thoroughly addressed the issues raised in view of the governing law, and made ample factual findings and legal conclusions. Crediting the testimony of both State witnesses and citing the well-established Terry[7]

---

[7] Terry v. Ohio, 392 U.S. 1 (1968).

A-4138-24

standard, the court was persuaded the stop and frisk were valid. In doing so, the court noted the absence of any indication in the record implying "Mauriello manipulated [d]efendant's clothing . . . to retrieve the handgun." Instead, the court found the record revealed the search "was limited to [d]efendant's hand and the waistband of his pants near his navel . . . . [t]he very area [d]efendant was 'reaching.'"

The court also rejected defendant's argument that Mauriello's failure to activate his BWC warranted an adverse inference under N.J.S.A. 40A:14-118.5(q)(2). Analyzing the BWC statute and May 2021 BWC Policy, the court noted the absence of any reference to "[SLEOs] in the definitional section of the Guidelines." The court further found N.J.S.A. 40A:118.3(a) "only covers certain agencies and departments" – not "a public housing entity," such as the NHA.

Quoting Section 3.1 of the May 2021 BWC Policy, the motion court emphasized:

> [E]very law enforcement agency shall promulgate and enforce a policy, standing operating procedure, directive, or order, in a form as may be appropriate given the customs and practices of the agency, which shall comply with the policies, standards, and requirements of this Policy. Any policy, standing operating procedure, directive, or order promulgated by an agency pursuant to this Policy shall provide that:

9

(a) a law enforcement officer employed by the agency <u>may only use a BWC system that has been issued and approved by the agency;</u>

(b) an officer <u>equipped with a BWC</u> must comply at all times with the requirements established in this Policy <u>and in the agency's policy, standing operating procedure, directive, or order issued pursuant to this Policy or by law</u>[.]

The court further recognized Section 3.2(a) of the May 2021 BWC Policy mandated certain officers "be equipped with BWCs," including "[a]ll uniformed patrol officers while acting in the performance of official duties, as required by N.J.S.A. 40A:14-118.3," which, in turn includes "[SLEOs] assigned to patrol or traffic law enforcement duties."

With those principles in view, the court found "[i]t is unclear that Mauriello is a[n] 'SLEO II' and that designation is not defined in the Guidelines," but "it is clear that Section 3.2(a) of the Guidelines cross-references the enabling statute, and it conclusively established that [SLEO] Mauriello works for an entity that is not covered by said statute." The court elaborated:

> Mauriello is admittedly in possession of BWC equipment that he purchased, but it is not a unit that was issued to him as the Guidelines require. Also, the NHA apparently has no operating procedure and policy in place related to the use of such units, perhaps because the NHA is not a law enforcement agency and is not required to provide the units to its personnel.

It occurs to the [c]ourt that there is a rather large loophole between the statute and Guidelines. The [c]ourt's recognition of the laudable spirit of the respective enactments does not give it authority to close this legislative gap.

Accordingly, this [c]ourt does not find Mauriello is covered by the statute, nor does it find that his failure to activate his own BWC constitutes noncompliance with the Guidelines. Indeed, had Mauriello used his own BWC to record the events of May 14, he would be doing so outside the black-letter requirements of the very Guidelines the defense asserts mandate its use.

Still, the defense's arguments are not lost on the [c]ourt. These can be freely made to a jury that presides over this case at a later date. However, on this record, . . . [d]efendant is not entitled to an adverse inference related to [SLEO] Mauriello's failure to activate the BWC.

[(Emphasis added).]

## II.

### A.

Our review of a trial court's decision on a suppression motion is circumscribed. See State v. Fenimore, 261 N.J. 364, 372-73 (2025). After a testimonial hearing, "appellate courts defer to the trial court's factual findings because the trial court has the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. S.S., 229 N.J. 360, 374 (2017) (quoting State v. Elders, 192 N.J. 224, 244

11

(2007)). We "must defer to the factual findings of the trial court on a motion to suppress so long as its findings are supported by sufficient credible evidence in the record." State v. Erazo, 254 N.J. 277, 297 (2023).

"An appellate court should not disturb the trial court's findings merely because 'it might have reached a different conclusion were it the trial tribunal' or because 'the trial court decided all evidence or inference conflicts in favor of one side' in a close case." State v. Nelson, 237 N.J. 540, 551 (2019) (quoting Elders, 192 N.J. at 244). "The governing principle, then, is that '[a] trial court's findings should be disturbed only if they are so clearly mistaken that the interests of justice demand intervention and correction.'" Id. at 551-52 (alteration in original) (quoting State v. Robinson, 200 N.J. 1, 15 (2009)).

"A trial court's legal conclusions, 'however, and the consequences that flow from established facts,' are reviewed de novo." State v. Bullock, 253 N.J. 512, 532 (2023) (quoting State v. Hubbard, 222 N.J. 249, 263 (2015)). We therefore conduct a de novo review of issues concerning statutory construction, including the meaning of a statute's terms. See State v. Olivero, 221 N.J. 632, 638 (2015).

B.

The touchstone for statutory interpretation is legislative intent, <u>Frugis v. Bracigliano</u>, 177 N.J. 250, 280 (2003), and the best indication of that intent is usually the text of the provision itself, read according to its plain meaning and in proper context, <u>DiProspero v. Penn</u>, 183 N.J. 477, 492 (2005); <u>see also</u> <u>State v. Keogh</u>, 481 N.J. Super. 67, 77 (App. Div. 2025). It is not the court's "function to rewrite a plainly written statute or to presume that the Legislature meant something other than what it conveyed in its clearly expressed language." <u>Murray v. Plainfield Rescue Squad</u>, 210 N.J. 581, 592 (2012). Nor should the court "'engraft requirements' on a statute 'that the Legislature did not include.'" <u>State v. Jones</u>, 475 N.J. Super. 520, 531 (App. Div. 2023) (quoting <u>Lippman v. Ethicon, Inc.</u>, 222 N.J. 362, 388 (2015)).

The statutory framework at issue requires activation of a BWC

> whenever the officer is responding to a call for service or at the initiation of any other law enforcement or investigative encounter between an officer and a member of the public, in accordance with applicable guidelines or directives promulgated by the Attorney General . . . . The [BWC] shall remain activated until the encounter has fully concluded and the officer leaves the scene.
>
> [N.J.S.A. 40A:14-118.5(c)(1).]

Under N.J.S.A. 40A:14-118.5(q)(2):

> If a law enforcement officer . . . fails to adhere to the recording . . . requirements . . . or intentionally interferes with a [BWC]'s ability to accurately capture audio or video recordings:
>
> . . . .
>
> (2) there shall be a rebuttable presumption that exculpatory evidence was destroyed or not captured in favor of a criminal defendant who reasonably asserts that exculpatory evidence was destroyed or not captured[.]

As we stated in Jones,

> in criminal prosecutions, the rebuttable presumption set forth in N.J.S.A. 40A:14-118.5(q)(2) provides a statutory remedy – a rebuttable presumption exculpatory evidence was destroyed or not captured – to a defendant where a law enforcement officer, employee, or agent failed to adhere to the recording or retention requirements in N.J.S.A. 40A:14-118.3 to -118.5, "or intentionally interfere[d] with a BWC's ability to accurately capture audio or video recordings," and the court also determines the defendant "reasonably asserts that exculpatory evidence was destroyed or not captured."
>
> [475 N.J. Super. at 533 (emphasis added) (quoting N.J.S.A. 40A:14-118.5(q)(2)).]

Under the BWC statute, a "[l]aw enforcement officer" is defined as "a person whose public duties include the power to act as an officer for the detection, apprehension, arrest, and conviction of offenders against the laws of

this State." N.J.S.A. 40A:14-118.5(a). The definition does "not include a correctional police officer." Ibid.

Pursuant to the SLEO Act, a "[s]pecial law enforcement officer" includes, in relevant part, "any person appointed pursuant to this act to temporarily or intermittently perform duties similar to those performed regularly by members of a police force of a local unit." N.J.S.A. 40A:14-146.9(h). The definition of a "[l]ocal unit" under the SLEO Act includes, in pertinent part, a municipality, which "ha[s] established a regular police force pursuant to law," N.J.S.A. 40A:14-146.9(c), and "may, as it deems necessary, appoint [SLEO]s sufficient to perform the duties and responsibilities permitted by local ordinances," subject to certain laws. N.J.S.A. 40A:14-146.10(a).

Class Two SLEOs are "authorized to exercise full powers and duties similar to those of a permanent, regularly appointed full-time police officer," N.J.S.A. 40A:14-146.11(a)(2), but are not "members of the police force of the local unit," N.J.S.A. 40A:14-146.14(a); see also N.J.S.A. 52:17B-67 (including SLEOs within the definition of a "[l]aw enforcement officer" under the Police Training Act, N.J.S.A. 52:17B-66 to -77). Whereas Class One SLEOs "may issue summonses for traffic violations and disorderly persons offenses" but may not carry firearms, Class Two SLEOs "are authorized to perform within the

municipality, all of the duties of a regular police officer and may, if so authorized by the municipality, carry and use firearms" after completing the required training and becoming certified. In re Special Police Officers, 354 N.J. Super. 269, 272-73 (App. Div. 2002).[8] However, SLEOs are supervised by the local unit's chief law enforcement officer. N.J.S.A. 40A:14-146.14(c). SLEOs must "comply with the rules and regulations applicable to the conduct and decorum of the permanent, regularly appointed police officers of the local unit," and the "rules and regulations applicable to the conduct and decorum of [SLEO]s." N.J.S.A. 40A:14-146.14(d).

## C.

Generally, warrantless searches and seizures are per se unreasonable and prohibited under the United States and New Jersey Constitutions absent a recognized exception to the warrant requirement. See State v. Smart, 253 N.J. 156, 164-65 (2023). "To justify a warrantless search or seizure, 'the State bears the burden of proving by a preponderance of the evidence that [the] warrantless

---

[8] In 2016, the Legislature amended the SLEO Act to create a third category of SLEOs, Class Three officers, who are "authorized to exercise full powers and duties similar to those of a permanent, regularly appointed full-time police officer while providing security at a public or nonpublic school or a county college" during specified hours. N.J.S.A. 40A:14-146.11(a)(3). Class Three SLEOs may carry a firearm subject to the SLEO Act's restrictions. Ibid.

search or seizure falls within one of the few well-delineated exceptions to the warrant requirement.'" State v. Vanderee, 476 N.J. Super. 214, 230 (App. Div. 2023) (alteration in original) (quoting State v. Chisum, 236 N.J. 530, 546 (2019)).

One such exception is the investigative or Terry stop. "A police officer may conduct an investigatory stop if, based on the totality of the circumstances, the officer had a reasonable and particularized suspicion to believe that an individual has just engaged in, or was about to engage in, criminal activity." State v. Stovall, 170 N.J. 346, 356 (2002) (citing Terry, 392 U.S. at 21). Thus, "the 'touchstone' for evaluating whether police conduct has violated constitutional protections is 'reasonableness.'" State v. Bard, 445 N.J. Super. 145, 157 (App. Div. 2016) (quoting State v. Hathaway, 222 N.J. 453, 476 (2015)); see also State v. Alessi, 240 N.J. 501, 523-24 (2020) (recognizing "an investigatory stop is an exception justified only by reasonable suspicion of involvement in a crime"). "[I]n determining the lawfulness of an investigatory stop, a reviewing court must 'evaluate the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted

and/or overbearing police intrusions.'"  State v. Privott, 203 N.J. 16, 25-26 (2010) (quoting State v. Davis, 104 N.J. 490, 504 (1986)).

A Terry stop and the frisk are analyzed under separate standards.  392 U.S. at 21-27.  "The first component of the Terry rule concerns the level of reasonable suspicion that must exist before an 'investigatory stop' legitimately may be undertaken."  State v. Thomas, 110 N.J. 673, 678 (1988); see also Terry, 392 U.S. at 21.

To conduct a frisk under Terry's second component, "[t]he officer must be able 'to point to particular facts from which he [or she] reasonably inferred that the individual was armed and dangerous.'"  Thomas, 110 N.J. at 679 (quoting Sibron v. New York, 392 U.S. 40, 64 (1968)).  Accordingly, police may search for weapons for self-protection if they reasonably believe the individual is armed and dangerous, "regardless of whether [the officer] has probable cause to arrest the individual for a crime."  Terry, 392 U.S. at 27.  As the motion court in the present matter recognized, under Terry, an officer may "conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault [the officer]."  Id. at 30.

In contrast to the analysis for a Terry stop, the totality of the circumstances for a frisk may include facts adduced after police initiate the stop.  See State v.

18

Valentine, 134 N.J. 536, 551 (1994) (upholding a frisk after a stop based, in part, on the defendant's refusal to remove his hands from his pockets and make eye contact with the officer). Factors supporting an articulable and reasonable suspicion that a suspect is armed and dangerous include: a suspect's movements toward his or her waistband, Privott, 203 N.J. at 30; a suspect's "hand move[ment] toward his [or her] inside jacket pocket," State v. Bellamy, 260 N.J. Super. 449, 457 (App. Div. 1992); and a suspect's "reaching into his [or her] pocket," Bard, 445 N.J. Super. at 157-58. Courts also may consider the officer's knowledge and experience, Valentine, 134 N.J. at 547-48 (citing Terry, 392 U.S. at 27), and "the lateness of the hour," id. at 547 (citing State v. Lund, 119 N.J. 35, 48 (1990)).

### III.

Against that legal backdrop, we turn to defendant's reprised arguments. In his merits brief, defendant maintains the BWC statutes' requirements applied to Mauriello because, by definition, a Class Two SLEO is a "law enforcement officer" under N.J.S.A. 40A:14-118.5(a). Noting the Legislature could have expressly excluded SLEOs from the BWC statute as it did with correctional officers, defendant contends the court erroneously construed the statutory scheme by restricting application of the BWC statute to employees of law

19

enforcement agencies. He further argues, in its implementation of the BWC statutes, the Attorney General Guidelines expressly included SLEOs as "covered parties." Defendant argues any ambiguity as to whether the BWC statutes apply to SLEOs should be construed in accordance with the Legislature's purpose to promote the use of BWCs and preserve BWC footage as evidence.

Asserting Mauriello failed to "adhere to the recording requirements" defendant contends he was entitled to the adverse inference "that the missing footage" from the stop and frisk "would have shown" he "did not fidget with his waistband in a manner that was indicative of possessing a gun." During oral argument before us, appellate counsel further argued Mauriello's failure to activate his personal BWC at the time of the encounter violated N.J.S.A. 40A:14-118.5(c), which requires activation of "a" BWC and, as such, does not limit activation to the BWC issued by the employing agency.

Defendant also challenges the court's decision upholding the stop and frisk. He maintains Mauriello's account of the incident fell short of articulating a "sufficient objective basis to believe" defendant "was armed and dangerous," and the court did not expressly make that finding. Defendant seeks reversal of the July 1, 2025 order. In the alternative, defendant requests a remand for a new suppression hearing before another judge.

A-4138-24

The State acknowledges the Attorney General Guidelines include Class Two SLEOs among the officers "required to be equipped with BWCs." But the State counters both the BWC statute and the Guidelines apply only "to law enforcement agencies, not the NHA." Noting the NHA – and not a "law enforcement agency" employed Mauriello, the State further asserts "the Guidelines did not apply to him." Urging us to uphold the court's decision, the State also notes "Mauriello was never issued a BWC by any law enforcement agency."

On de novo review, we have considered defendant's renewed contentions in view of the governing statutes and Attorney General Guidelines, and affirm substantially for the reasons stated in the court's well-reasoned decision. Accordingly, we conclude defendant failed to demonstrate an adverse inference was warranted, and the substantial credible evidence in the record supports the court's decision Mauriello had reasonable suspicion to stop defendant and "reasonably inferred [he] was armed and dangerous." See Thomas, 110 N.J. at 678; see also Privott, 203 N.J. at 30. We add only the following brief remarks.

We part company with the motion court's determination Mauriello was not a Class Two SLEO. At the time of the incident, Mauriello was employed by the NHA, armed with a service weapon, and had powers of arrest and, by definition,

he was a Class Two officer. See N.J.S.A. 40A:14-146.11(a) (delineating the powers of Class One, Two, and Three officers). However, that classification has no bearing on whether Mauriello violated the BWC statute, warranting an adverse inference under N.J.S.A. 40A:14-118.5(q)(2). Pursuant to the plain language of the statute, see DiProspero, 183 N.J. at 492, because the NPD did not issue Mauriello a BWC, he did not "fail to adhere to the [statutory] recording or retention requirements," N.J.S.A. 40A:14-118.5(q). And because Mauriello did not activate his personal BWC during his encounters with defendant, he complied with Section 3.1(a) of the Attorney General Guidelines, which require the use of "a BWC system" only if that system "has been issued and approved by the agency."[9]

We recognize the NPD commenced BWC training for its SLEOs, but never issued BWCs to those officers, including Mauriello. However, the motion record does not include the policy, if any, the NPD promulgated for issuance of BWCs to its SLEOs and, as such, we make no assumptions about its existence or parameters. See N.J. Dep't of Child. & Fams. v. A.L., 213 N.J. 1, 28 (2013)

---

[9] The reasons underscoring the Attorney General's requirement are consonant with Section 9.1 of the BWC policy (mandating departments "establish and maintain a system and procedures to ensure the integrity and proper handling and storage of all BWC recordings").

(recognizing neither trial courts nor appellate courts can "fill in missing information on their own").  In any event, any failure by the NPD to issue Mauriello a BWC created a factual impossibility for him to adhere to the BWC statute and Attorney General Guidelines.

Finally, similar to the motion court, we recognize the divide between the BWC statutory scheme and the Guidelines.  We similarly conclude defendant's argument "is best left for consideration by the [l]egislative and [e]xecutive branches of government."  State v. Burns, 462 N.J. Super. 235, 248 (App. Div. 2020) (quoting In re Declaratory Judgment Actions Filed by Various Muns., 446 N.J. Super. 259, 267 (App. Div. 2016), aff'd as modified, 227 N.J. 508 (2017)); see also State v. Saavedra, 433 N.J. Super. 501, 525 (App. Div. 2013), (declining "to intrude into the policy-making arena, an area traditionally reserved in our tripartite system of governance to the legislative and executive branches"), aff'd, 222 N.J. 39 (2015).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division