**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2614-18T1

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

KEVIN KELLY, a/k/a
KEVIN PALLANTA and
KEVIN T. KELLYPALLANTA,

      Defendant-Appellant.

_____

Submitted September 23, 2020 – Decided November 6, 2020

Before Judges Accurso, Vernoia and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 18-06-0552.

Joseph E. Krakora, Public Defender, attorney for appellant (Bryan A. Small, Designated Counsel, on the briefs).

Jennifer Webb-McRae, Cumberland County Prosecutor, attorney for respondent (Andre R. Araujo, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Kevin Kelly appeals from the denial of his suppression motion and his conviction following a jury trial in October 2018. We affirm the suppression ruling, substantially for the reasons outlined in the motion judge's written opinion. We also affirm defendant's conviction.

At approximately 3:00 a.m. on September 5, 2017, police received an anonymous tip that two white males were parked in a black Cadillac in a certain section of Millville known to be a high-crime area, and that the passenger had a handgun in his lap. The tipster reported that the suspect vehicle was parked behind a silver minivan, the driver wore a black t-shirt, and the passenger wore a white t-shirt.

When Officer Bryan Orndorf went to the area to follow up on the tip, he found a black Cadillac parked behind a silver minivan, as described by the tipster. Two additional officers joined Officer Orndorf on scene. The suspect vehicle had heavily-tinted windows. Even after the officers shined spotlights on the car, they could not determine whether it was occupied and if so, how many occupants might be in the car. Officer Orndorf used his patrol car's loudspeaker to instruct the driver (later identified as defendant) to roll down the window. The officer received no response to his request. Twenty seconds later, he again

2

asked the driver to roll his window down. Defendant only partially lowered his window, so the officer instructed him to roll all the car windows down. Defendant rolled just his window down. He never lowered the remaining windows. When Officer Orndorf asked defendant if anyone else was in the car, defendant avoided the question.

One of the officers at the scene expressed a concern that while the driver displayed his left hand outside the vehicle, he did not "know what [the driver was] doing with is right hand." Accordingly, defendant was ordered out of the car. Even though defendant was directed to keep his hands raised, when he exited the vehicle, he immediately shut the door behind him. Officer Orndorf noted defendant was Caucasian and wore a black t-shirt, consistent with the tip. Defendant was promptly patted down to ensure he did not have a weapon on his person. Defendant referred to the vehicle as "my" car, and then told an officer it belonged to his roommate, a female whose last name he did not know. He again was asked if anyone else was in the car but evaded the question. According to Officer Orndorf, defendant was handcuffed and placed in a patrol car "until [the police] did [their] investigation."

Eventually, defendant told Officer Orndorf that another person, Christopher Meyers, was in the car. The police ordered Meyers out of the

vehicle and as he stepped out, they noted he was Caucasian and wore a white t-shirt, consistent with the tipster's information. Meyers left his passenger door open, with the window up. He was patted down for weapons, handcuffed, and placed in a separate police car pending further investigation.

Although no weapon was recovered by this point, an unidentified officer told defendant he spotted a "needle" in the car. While standing outside the vehicle, Officer Orndorf also saw the orange cap of the syringe before it was retrieved. Officer Orndorf confirmed the needle protruded between the center console and the driver seat, and he "recognized what that was."

The unidentified officer told defendant a dog was going to perform an exterior sniff of the vehicle, and if the dog alerted to the car, the police would impound the vehicle and request a search warrant. Subsequently, the canine dispatched to the scene positively alerted to the Cadillac. Officer Tyler Menz then retrieved the syringe from the car, spoke to his sergeant, and went back to the car to recover a BB gun he had spotted inside the vehicle while retrieving the syringe. Defendant was placed under arrest once the syringe was found. As the suppression judge noted, before the canine sniff occurred, one of the officers briefly put his head inside the Cadillac through the open driver side window. However, the judge was unable to discern from the motor vehicle recording

(MVR) footage of the incident whether the officer placed his head inside the Cadillac before or after the police discovered the syringe.

Defendant's car was impounded after the canine sniff. The police obtained a search warrant for the Cadillac, and when it was executed, they recovered two rifles, a dagger and a sawed-off shotgun.

Defendant moved to suppress the evidence from the stop. The suppression judge denied the application, based on his review of the MVR footage and the credited testimony of Officer Orndorf, as well as the testimony of another officer. Defendant was convicted of third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5b(2); fourth-degree possession of a prohibited weapon, specifically, a blade larger than five inches, N.J.S.A. 2C:39-3(e); and second-degree possession of a weapon by a convicted person, N.J.S.A. 2C:39-7.

Following defendant's conviction, the trial judge denied his motion for judgment notwithstanding the verdict as to the second- and third-degree offenses. At sentencing, defendant received an eight-year prison term with a five-year parole disqualifier for second-degree possession of a weapon by a convicted person; a four-year term for third-degree unlawful possession of a

weapon; and an eighteen-month term for fourth-degree possession of a prohibited weapon. The judge directed that the sentences run concurrently.

On appeal, defendant raises the following arguments:

POINT I

> THE WEAPONS FOUND IN [DEFENDANT'S] VEHICLE SHOULD HAVE BEEN SUPPRESSED, OR ALTERNATIVELY, A NEW SUPPRESSION HEARING SHOULD OCCUR, BECAUSE THE PROSECUTOR FAILED TO PRESENT ANY EVIDENCE THAT THE SEARCHING OFFICER - WHO DID NOT TESTIFY - HAD ACTED REASONABLY IN STOPPING AND SEARCHING THE VEHICLE AND BREAKING THE THRESHOLD TO LOOK INSIDE.

POINT II

> THE WEAPONS FOUND IN [DEFENDANT'S] VEHICLE SHOULD HAVE BEEN SUPPRESSED BECAUSE THE STATE FAILED TO ESTABLISH THE BONA FIDES OF THE CANINE WHO PERFORMED THE SNIFF FOR [A CONTROLLED DANGEROUS SUBSTANCE] TO SUPPORT PROBABLE CAUSE TO SEARCH THE VEHICLE. (NOT RAISED BELOW).

POINT III

> [DEFENDANT'S] CONVICTION FOR UNLAWFUL POSSESSION OF A FIREARM AND POSSESSION OF A WEAPON BY A CONVICTED PERSON MUST BE VACATED BECAUSE AIRSOFT GUNS ARE NOT FIREARMS[.] (NOT RAISED BELOW).

6

POINT IV

THE CONVICTION OF POSSESSION OF A PROHIBITED WEAPON SHOULD BE VACATED BECAUSE THE STATE FAILED TO PROVE THAT [DEFENDANT] POSSESSED A WEAPON WITH AN UNLAWFUL PURPOSE UNDER N.J.S.A. 2C:39-3 AND THE STATE'S PER SE BAN ON DAGGERS IS UNCONSTITIONAL[.] (NOT RAISED BELOW).

    A.    The State Failed to Prove that [Defendant] Possessed A Weapon with An Unlawful Purpose Under N.J.S.A. 2C:39-3.

    B.    The State's Per Se Ban on Daggers Is Unconstitutional.

POINT V

THE TRIAL COURT PREJUDICED [DEFENDANT] BY FAILING TO PROPERLY INSTRUCT THE JURY ON THE EFFECTS OF A PARTIAL VERDICT AND BY FAILING TO REMIND [JURORS] OF THEIR OBLIGATION NOT TO SURRENDER THEIR HONEST CONVICTIONS MERELY TO RETURN A VERDICT[.] (NOT RAISED BELOW).

POINT VI

THE TRIAL COURT FAILED TO TAKE APPROPRIATE ACTION WITH RESPECT TO A SLEEPING JUROR[.] (NOT RAISED BELOW).

POINT VII

THE STATE FAILED TO PROVIDE A SUPPLEMENTAL POLICE REPORT RELATED TO

7

[] CO-DEFENDANT MEYERS[,] CONTRARY TO ITS OBLIGATIONS UNDER THE RULES OF COURT.

Regarding Point I, we "must uphold a trial court's factual findings at a [motion to suppress] hearing when they are supported by sufficient credible evidence in the record." State v. Hathaway, 222 N.J. 453, 467 (2015) (citing State v. Elders, 192 N.J. 224, 244 (2007)). This is especially true when the findings of the trial court are "substantially influenced by [its] opportunity to hear and see the witnesses and to have the 'feel' of the case." Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). By contrast, the trial court's interpretation of the law and the legal "consequences that flow from the established facts" are reviewed de novo. State v. Gamble, 218 N.J. 412, 425 (2014).

No constitutional justification is required for a police officer to conduct a field inquiry. State v. Sirianni, 347 N.J. Super. 382, 387 (App. Div. 2002). "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen . . . ." Florida v. Royer, 460 U.S. 491, 497 (1983); Sirianni, 347 N.J. Super. at 388. If the person remains free to disregard the

officer's questions and walk away, a seizure has not occurred, and Fourth Amendment protections are not implicated. United States v. Mendenhall, 446 U.S. 544, 553 (1980). However, "'[i]f, during the course of'" an officer's reasonable inquiries, "the circumstances 'give rise to [unrelated] suspicions . . ., an officer may broaden [the] inquiry and satisfy those suspicions.'" State v. Chapman, 332 N.J. Super. 452, 462 (App. Div. 2000) (quoting State v. Dickey, 152 N.J. 468, 479-80 (1998)).

An investigatory detention "occurs during a police encounter when 'an objectively reasonable person' would feel 'that his or her right to move has been restricted.'" State v. Rosario, 229 N.J. 263, 272 (2017) (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)). The United States and New Jersey Constitutions allow an investigatory stop "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968); State v. Davis, 104 N.J. 490, 504-05 (1986). "[A] group of innocent circumstances in the aggregate can support a finding of reasonable suspicion." State v. Stovall, 170 N.J. 346, 368 (2002).

"An anonymous tip, standing alone, is rarely sufficient to establish a reasonable articulable suspicion of criminal activity." Rodriguez, 172 N.J. at

9

127 (citations omitted). "When an anonymous tip is involved, additional factors must be considered to generate the requisite level of reasonable and articulable suspicion." State v. Privott, 203 N.J. 16, 26 (2010) (citations omitted). "[T]he reliability of an informant's tip must be analyzed in light of the totality of the circumstances." State v. Williams, 364 N.J. Super. 23, 31 (App. Div. 2003) (citing Illinois v. Gates, 462 U.S. 213, 238 (1983); State v. Novembrino, 105 N.J. 95, 122 (1987)). "[T]here are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" Florida v. J.L., 529 U.S. 266, 270 (2000) (citation omitted).

"An informant's 'veracity' and 'basis of knowledge' are two highly relevant factors under the totality of the circumstances." State v. Zutic, 155 N.J. 103, 110 (1998) (citing State v. Smith, 155 N.J. 83, 92 (1998)). However, "[a] deficiency in one of those factors 'may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.'" Id. at 110-11 (quoting Gates, 462 U.S. at 233).

Here, as the suppression judge observed, the police did not immediately move to arrest defendant or his passenger when they saw the Cadillac parked in the location matching the tipster's description. Additionally, they did not

surround defendant's vehicle. Instead, the police shined spotlights into the car to be able to see inside. The judge concluded that a critical fact in this "fluid situation" was that officers could not tell if anyone was inside the car because of the heavily tinted windows. As it "was almost 3[:00] a.m. and the location [of the Cadillac] was a high crime area," the judge recognized "the potential for danger" that prompted the police not to approach the Cadillac, but use a loudspeaker to ask the driver to roll down his window.

We agree with the suppression judge that the act of shining the spotlights was not intrusive. See State v. Reininger, 430 N.J. Super. 517, 534 (App. Div. 2013) (holding that the use of a flashlight by an officer to observe the interior of a car does not turn an observation into a search). Likewise, we agree with the judge that communicating by loudspeaker was objectively reasonable and "unobtrusive" under the circumstances, particularly since the police were following up on an anonymous tip about a handgun on the lap of one of the vehicle's occupants.

As their use of a loudspeaker did not result in any response, the police waited less than a minute before they again asked defendant to lower his window. Instead of complying, defendant "attempted to conceal himself behind the tint by only lowering the window a couple of inches" and he never complied

11

with the request to lower all his windows. "To be sure, a blatant attempt to hide from the police can augment suspicion." State v. Alessi, 240 N.J. 501, 523 (2020) (citing State v. Valentine, 134 N.J. 536, 551 (1994)).

Regarding the request of the police to have defendant exit his vehicle, we note that the United States Supreme Court long ago confirmed it is "objectively reasonable for officers to order a driver out of a lawfully stopped vehicle" as removal constitutes "only a minor intrusion into a driver's personal liberty." State v. Bacome, 228 N.J. 94, 104 (2017) (citing Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977)). On the record before us, we are satisfied the police had reasonable suspicion to not only ask defendant to exit the Cadillac, but to also detain him to conduct a further investigation once he exited the Cadillac. See State v. Matthews, 398 N.J. Super. 551, 559 (App. Div. 2008) (confirming the existence of a tip, the lateness of the hour, and the confirmation of the type, color, and location of the vehicle reported in the tip justified an investigatory stop to permit the police to inquire what the occupants of the vehicle were doing).

Additionally, an officer's "suspicions may be raised so as to enable him to expand the scope of the stop and ask additional, more intrusive, questions" or

even alight a passenger from the vehicle. United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994); accord State v. Smith, 134 N.J. 599, 618 (1994).

> [B]ecause of the need to protect police officers and because of the minimal intrusion the requirement to exit the car imposes on the passenger . . . . the officer need point only to some fact or facts in the totality of the circumstances that would create in a police officer a heightened awareness of danger that would warrant an objectively reasonable officer in securing the scene in a more effective manner by ordering the passenger to alight from the car.
>
> [Smith, 134 N.J. at 618.]

Here, the police were warned by an anonymous tipster in the early morning hours that a person parked in a Cadillac, in a high-crime area, had a gun in his lap, and they observed defendant try to hide from them, and ignore their requests to lower his windows and to keep his hands up. Thus, we are satisfied the police were justified in asking him to exit his vehicle. Further, due to their heightened suspicion, the police also had sufficient grounds to ask Meyers to step out of the Cadillac.

Once defendant stepped out of the Cadillac, the police were able to verify that his attire matched the description of the tipster. Since defendant's clothing could not be seen at night through the heavily tinted windows of the vehicle, the fact the tipster accurately described defendant's attire contributed to the officers'

13

reasonable suspicion and supported the reliability of the tip. The same is true for what occurred when Meyers exited the vehicle, as his attire and race also matched the tipster's description. As we have stated, the "basis of knowledge" for a tip is a highly relevant factor under the totality of the circumstances analysis. Thus, we are persuaded the suppression judge properly found the anonymous tip was sufficiently reliable to justify the investigatory stop that occurred once defendant was ordered out of the vehicle. The judge aptly reasoned:

> A critical fact that cannot be ignored and was immediately apparent to the officers is that the vehicle had heavily tinted windows. The legality of such tinted windows is not the issue. It is the fact that the tint completely obscured the view of the interior even when subjected to police spotlights. At the time the officers arrived and even after [defendant] was removed from the vehicle, officers were still unable to determine if anyone else was inside the car . . . . The existence of the tint not only increases the risk to the officers responding to the anonymous report but also tells them something about the person who made the report. The detail in the tip as to the race and clothing worn by the individuals inside the vehicle with the blacked[-]out windows indicates that the reporting person had the ability to see inside the vehicle, something the officers could not do by looking at the vehicle. Confirmation of those specific facts indicates that the reporting person may have been inside the vehicle or had close access in order to make those observations of the interior, at night. This demonstrates that the tip is reliable not because they confirmed the description

A-2614-18T1

offered in the tip, but because the location, time of day and difficulty seeing inside the vehicle demonstrated that the tipster had the ability to have close contact with the individuals in the car. This provided confirmation that "the tipster had knowledge of concealed criminal actions." Gamble, 218 N.J. [at 428-29] (citing [J.L.], 529 U.S. [at 272]).

Lastly, the tip indicated that there was a handgun in this vehicle on the lap of one of the occupants. "[T]he greater the threat to public safety, []the greater the need may be for prompt action, and thus allowances must be made for the fact that perfect knowledge is often not attainable at the moment the police must act." Hathaway, 222 N.J. [at 472].

The suppression judge's reasoning is consistent with the analysis in State v. Arthur, 149 N.J. 1, 11 (1997), where our Supreme Court confirmed that "[p]olice officers should consider whether a defendant's actions are more consistent with innocence than guilt; however, simply because a defendant's actions might have some speculative innocent explanation does not mean that they cannot support articulable suspicions if a reasonable person would find the actions are consistent with guilt."

We also recognize that a police officer is permitted to pat down a citizen's outer clothing incident to a Terry stop when the officer perceives a risk to his or her safety and has reason to believe that the individual is armed and dangerous. State v. Diloreto, 180 N.J. 264, 276 (2004). The officer need not be absolutely

15

certain that the individual is armed; "the test under <u>Terry</u> 'is whether a reasonably prudent man [or woman] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger.'" <u>Ibid.</u> (quoting <u>Terry</u>, 392 U.S. at 27). "[T]he same conduct that justifies an investigatory stop may also present the officer with a specific and particularized reason to believe that the suspect is armed." <u>Privott</u>, 203 N.J. at 30. Such is the case here, particularly since the conduct of defendant enhanced, rather than assuaged the officers' concerns that he had access to a weapon in his vehicle. Indeed, the police were properly concerned for their safety, at this point in their investigation, to warrant the pat down given defendant's behavior, the late hour, the high-crime area, the existence and reliability of the anonymous tip, and the ongoing risk that one of the occupants of the vehicle possessed a gun. <u>State v. Robinson</u>, 228 N.J. 529, 544 (2017).

Next, defendant contends his suppression motion should have been granted because after the stop, an officer improperly "broke the threshold" of the Cadillac by placing his head inside the driver's side window. Again, we are not convinced.

Consistent with the Fourth Amendment to the United States Constitution and Article I, ¶ 7 of the New Jersey Constitution, the police must "obtain a

16

warrant 'before searching a person's property, unless the search falls within one of the recognized exceptions to the warrant requirement.'" State v. Cassidy, 179 N.J. 150, 159-60 (2004) (quoting State v. DeLuca, 168 N.J. 626, 631 (2001)). Because a warrantless search is presumed invalid, the State has the burden to prove, by a preponderance of evidence, that it "'falls within one of the few well-delineated exceptions to the warrant requirement.'" State v. Pineiro, 181 N.J. 13, 19-20 (2004) (quoting State v. Maryland, 167 N.J. 471, 482 (2001)).

One such exception is the protective sweep of a vehicle. It is permissible for law enforcement to conduct a warrantless search of a vehicle's passenger compartment when the totality of circumstances supports a reasonable suspicion a driver or passenger is dangerous and may gain immediate access to weapons. Gamble, 218 N.J. at 431-32.

Here, the suppression judge concluded a valid protective sweep of the Cadillac was appropriate due to: the reliability of the tip, which "indicated there was a handgun in the car on the lap of one of the occupants"; defendant's failure to obey Officer Orndorf's commands or answer the officer's questions about whether there was anyone else in the vehicle; the heavily tinted windows on the suspect car which prevented the police from seeing its interior; and the high-crime location of the vehicle at three o'clock in the morning. Given the totality

17

of these circumstances, we agree with the judge that the limited sweep was reasonable, as "it was probable that the defendant [and his passenger] would have been returned to their vehicle, thereby exposing the officers to the danger that those individuals would then have immediate access to any firearms that may be contained therein." As the judge correctly noted, "the fact that no weapon was located on either [the] defendant [or his passenger] when searched . . . did not eliminate the risk of their access to a weapon when returned to the vehicle." The judge added that

> the limited intrusion created by the officer, placing his head through the open window and, given the nature of the risk to officer safety, the likelihood that the defendants would have been permitted to return to their vehicle had the syringe not been seen . . . same was reasonable in this specific situation.

It is evident, then, that the same reasonable suspicion that justified the investigatory stop also justified the detention of defendant and his passenger for a brief additional period while the police conducted a protective sweep for the reported weapon, with which defendant and his passenger could have armed themselves if released by the police. Gamble, 218 N.J. at 433. Certainly, the police were "authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." United States v. Hensley, 469 U.S. 221, 235 (1985). See also State

18

v. Padilla, 321 N.J. Super. 96, 108 (App. Div. 1999) (ruling that officers had the right to draw their handguns where a caller reported a person with a gun).

We also see no basis to disturb the judge's finding that based on the "inevitable discovery doctrine," the police were permitted to retrieve items from the Cadillac after detaining defendant.  The inevitable discovery exception to the exclusionary rule applies where:

> (1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.
>
> [State v. Sugar, 100 N.J. 214, 238 (1985).]

Here, the suppression judge found that the discovery of the items retrieved by Officer Menz, i.e., the syringe and BB gun, was inevitable because defendant "was informed he was under arrest for the 'needle,' the dog sniff had already occurred and the decision to seek a warrant was already made."  The judge's factfinding in this regard is overwhelmingly supported by credible evidence in the record.  Accordingly, the motion judge's legal conclusions are unassailable.

We need not address at length defendant's Point II. As defendant did not challenge the canine's qualifications before the trial court, we review his claim for plain error. R. 2:10-2.

While defendant contends the State did not adequately establish the qualifications of the canine that performed the sniff, the State counters that information about the canine's qualifications was provided in discovery. We are convinced that even if the State neglected to provide the canine's qualifications to defendant in discovery, he could and should have raised any challenge regarding the canine's qualifications in an appropriate application to the trial court. Having failed to do so, the current challenge is deemed waived. R. 3:5-7(f). See also State v. Kim, 412 N.J. Super. 260, 268-71 (App. Div. 2010). While we often review allegations of error not brought to a trial judge's attention, we need not consider such an issue unless it goes to the jurisdiction of the trial court or concerns matters of substantial public interest. State v. Robinson, 200 N.J. 1, 20-22 (2009). Accordingly, we are persuaded this issue is not properly raised before us.

In Point III, defendant argues for the first time on appeal that his conviction for unlawful possession of a firearm and possession of a weapon by a convicted person cannot stand because airsoft guns are not firearms. Again,

we review this argument under the plain error standard, consistent with <u>Rule</u> 2:10-2.

As the motion judge noted, during the investigatory stop, when the syringe and gun were recovered from the Cadillac, defendant was heard on the MVR telling an officer the gun was a BB gun. Also, at trial, Officer Menz confirmed the gun he retrieved from the car during the stop was a "CO2 powered BB gun."

Defense counsel lodged no objection when the State sought to admit the BB gun, as well as the MVR referencing the gun, into evidence at trial. Still, defendant argues that "a person is not guilty of possession of a firearm for an unlawful purpose if the gun was a toy," citing <u>State v. Gantt</u>, 101 N.J. 573 (1986). His reliance on this case is misplaced, however, as <u>Gantt</u> also favorably cites to another case that classified BB guns as handguns.[1]

N.J.S.A. 2C:39-5(b) provides:

> (1) Any person who knowingly has in his possession any handgun . . ., without first having obtained a permit to carry the same . . ., is guilty of a crime of the second degree. (2) If the handgun is in the nature of an air gun, spring gun or pistol or other weapon of a similar nature in which the propelling force is a spring, elastic

---

[1] "[T]his latter class of less-familiar firearms 'can best, and perhaps only, be described in terms of their operation.' [<u>State v. Gantt</u>,] 195 N.J. Super. [114,] 117 [(App. Div. 1984)]. <u>See also</u> <u>State v. Mieles</u>, 199 N.J. Super. 29 (App. Div. 1985) (holding that Code's definition is broad enough to include a BB gun as a firearm)." <u>Gantt</u>, 101 N.J. at 584.

band, carbon dioxide, compressed or other gas or vapor, air or compressed air, or is ignited by compressed air, and ejecting a bullet or missile smaller than three-eighths of an inch in diameter, with sufficient force to injure a person it is a crime of the third degree.

In order to be found guilty of the "certain persons" statute, N.J.S.A. 2C:39-7(b)(1), the State must prove that: (1) there was a firearm; (2) defendant had possessed or controlled that firearm; and (3) defendant had previously been convicted of, among other things, a qualifying predicate offense. Model Jury Charges (Criminal), "Certain Persons Not To Have Firearms (N.J.S.A. 2C:39-7(b)(1))" (rev. Feb. 12, 2018).

Since BB guns commonly utilize air, carbon dioxide or some other compressed gas to fire small projectiles, they clearly fall under the definition set forth in N.J.S.A. 2C:39-5(b)(2). See Mieles, 199 N.J. Super. at 37-38. Given that the BB gun found in defendant's possession qualified as a handgun and he does not contest he was previously convicted of a qualifying predicate offense, we find no basis to vacate defendant's conviction as a certain person for the unlawful possession of a weapon.

In Point IV, defendant claims his conviction must be vacated because the State failed to prove he possessed a dagger for an unlawful purpose, N.J.S.A. 2C:39-3(e). It is unclear whether defendant's argument regarding the State's

22

proofs equates to a claim that his conviction for this weapons offense was against the weight of the evidence. If so, it would appear he challenges the denial of his motion for judgment notwithstanding the verdict. However, "the trial court's ruling on such a motion shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1.

As a threshold issue, we note the trial judge conducted the charge conference required by Rule 1:8-7(b). Based on that charge conference, the judge, without objection from defendant, instructed the jury:

> In order to convict the defendant of [possession of a knife with a blade larger than five inches], you must be satisfied that the State has proved beyond a reasonable doubt both of the following elements:
>
> . . . .
>
> The first element that the State must prove beyond a reasonable doubt is that Exhibit S-19 is a dagger. A dagger has been defined as a knife with a very sharp point and one or two sharp edges, typically designed or capable of being used as a thrusting or a stabbing weapon. Most daggers [also] feature a full cross guard to keep the hand from riding [] forward [] onto the sharpened blade edges. The second element that the State must prove beyond a reasonable doubt is that the defendant knowingly possessed Exhibit S-19 at the time and place alleged.
>
> . . . .

> Under our law, possession can be actual or constructive, sole or joint. And I also provided information previously regarding the inference that you may draw regarding possession when a weapon is found within a vehicle . . . . Finally, in order to find the defendant guilty, the State must prove beyond a reasonable doubt that the defendant's possession of the dagger was without . . . any explainable, lawful purpose.

N.J.S.A. 2C:39-1(r)(3) designates a dagger as a prohibited weapon but does not define the term "dagger." Accordingly, pursuant to the Model Criminal Jury Charges, a standard dictionary definition should be utilized to explain to a jury what is meant by the term.[2] Here, the trial judge followed the Model Criminal Jury Charges and instructed the jury, without objection from defense counsel, that a dagger is "a knife with a very sharp point and one or two sharp edges, typically designed or capable of being used as a thrusting or a stabbing weapon." We note this is the same definition the judge discussed with counsel at the charging conference.

---

[2] "The weapons statute provides specific definitions for three of the weapons mentioned in N.J.S.A. 2C:39-3[(e)]. See N.J.S.A. 2C:39-1h for 'gravity knife,' N.J.S.A. 2C:39-1p for 'switchblade knife,' and N.J.S.A. 2C:39-1u for 'ballistic knife.' A standard dictionary definition should be used for instructional purposes whenever an indictment alleges possession of another type of weapon (dagger, dirk, stiletto, etc.) prohibited by N.J.S.A. 2C:39-3[(e)]." Model Jury Charges (Criminal), "Possession of Certain Weapons (N.J.S.A. 2C:39-3[(e)])," n.3 (rev. Feb. 9, 2009).

At trial, Officer Menz testified that he found the offending knife in the Cadillac after defendant exited the car and was detained. The trial record is devoid of any evidence defendant had an explainable lawful purpose for the dagger. Thus, once the judge properly instructed the jury regarding the definition of a dagger, and the elements the State needed to prove under N.J.S.A. 2C:39-3(e), we are satisfied the jury had a sufficient understanding of the evidence before it to find defendant guilty of violating this statute.

The defendant further claims the State's per se ban on daggers is unconstitutional. He contends the broad definition of a dagger under N.J.S.A. 2C:39-3(e) "has the effect of acting as a per se prohibition on the possession of daggers . . . . [and] runs afoul of the Second Amendment to the United States Constitution." Again, we are not convinced.

"'A legislative act will not be declared void unless its repugnancy to the constitution is clear beyond reasonable doubt.'" State v. Buckner, 223 N.J. 1, 14 (2015) (quoting Gangemi v. Berry, 25 N.J. 1, 10 (1957)). "When reasonable people 'might differ' about the constitutionality of a law, courts must 'defer[] to the will of the lawmakers.'" Id. at 15 (quoting N.J. Ass'n on Corr. v. Lan, 80 N.J. 199, 220 (1979)).

Here, the Legislature determined that a dagger is so dangerous that mere possession is prohibited, unless there is evidence a defendant has an explainable lawful use for the weapon. Stated differently, if there is evidence a defendant has an explainable lawful purpose for a dagger, the State is unable to prove the violation of N.J.S.A. 2C:39-3(e). Accordingly, defendant's contention that the prohibition on daggers "must face the same constitutional fate as per se prohibitions on other types of weapons" ignores the fact that the Legislature included an "escape hatch" in the challenged statute, which allows for the possession of daggers for an "explainable lawful purpose." Under these circumstances, defendant has not met the heavy burden of establishing the invalidity of N.J.S.A. 2C:39-3(e).

We also find defendant's novel argument in Point V unpersuasive. Approximately three-and-a-half hours after jurors began their deliberations, they sent a note to the trial judge which read: "We can only agree on one charge. We cannot come to an agreement on remaining charges. What do we do?" The judge and counsel discussed how to answer the note and the judge proposed his response. The judge then asked defense counsel if he had "any other ideas," to which counsel replied, "I don't." Thus, the judge instructed the jury as follows:

> [M]y answer to you is as follows. You keep
> deliberating. Okay? . . . . [Y]ou're going to need to

26

keep deliberating and, you know, we look at the time and the complexity of the case and the number of hours of testimony, that type of thing. And although it seems like a long day for you, in the grand scheme of things it's been about three and half to . . . three hours and forty-five minutes of deliberations, minus lunch and the time that it took, the charge and everything else . . . . [A]lthough it might seem like a long time to you, in the grand scheme of things, it's not that long. I will tell you this. If you need help on the definitions of whatever it is that I gave you in the charge, if you need me to try and explain something to you, maybe that's different than the way it might be written in the charge I'll be more than happy to assist. If you need to listen to testimony, it will be played back to you and it will come through a speaker. We can do that as well. But for now, I'm going to ask you to continue to go back into the deliberation room and continue deliberating. Okay? . . . . [Y]ou guys can chat about it. If you want to listen to something, if you needed a specific instruction on the law in some fashion, you know, write a note. We're here for you.

We are mindful the jury did not state in its note that it was hopelessly deadlocked on the remaining charges after it reached agreement on one charge. Instead, the jury asked for guidance on how to proceed. Given the brevity of the jury's deliberations, the lack of objection by defense counsel to the judge's proposed response to the jury's note, and the lack of coercion in the judge's response to the jury, we are persuaded it was not plain error for the court to require the jury to continue its deliberations, rather than instruct it about the effects of a partial verdict. See State v. Figueroa, 190 N.J. 219, 240 (2007).

Likewise, we are not convinced the judge committed plain error by not repeating his earlier instruction to the jury not to "surrender [their] honest conviction as to the weight or [effect of] evidence solely because of the opinion of [their] fellow jurors or for the mere purpose of returning a verdict." Our conclusion is bolstered by the fact that defense counsel did not ask for this instruction to be repeated, nor does the record reflect the jury had difficulty following the judge's initial instructions.

We readily dispense with defendant's claim in Point VI. Trial judges should take corrective action when counsel bring a sleeping juror to the judge's attention. State v. Scherzer, 301 N.J. Super. 363, 491 (App. Div. 1997). If the judge takes corrective action after learning of a sleeping juror and defense counsel does not request any further action, there is no reversible error. Ibid.

Here, the judge, on the record, addressed his observations of inattentive Juror Number One. The judge noted this juror was not asleep the first time the prosecutor brought it to his attention. But when the issue was raised a second time, the judge found the juror was asleep during testimony and he expressed his concern about this behavior. The judge advised counsel to discuss the matter over lunch to decide how they would like to handle the matter. Defense counsel responded, "[l]et's keep our eye on him in the afternoon session and see what

develops." As the discussion about Juror Number One continued, defense counsel reiterated, "I think we should keep our eyes on him in the afternoon session and . . . see how he's doing in the afternoon session." The judge deferred to defense counsel's wishes. It does not appear from the record that Juror Number One, or any juror for that matter, was sleeping or inattentive that afternoon.

The next day, the judge received a note from one of the jurors regarding Juror Number One's inattentiveness. The judge promptly addressed the note with counsel, and each attorney asked that the inattentive juror be dismissed. Moreover, without objection from counsel, two of the three jurors who had discussed Juror Number One's behavior were asked on the record if they could proceed with the case and remain fair and impartial. Both jurors responded affirmatively. Defense counsel declined to speak to the third juror about her ability to continue in the case, stating, "well, frankly, I think I know the answer." Under these circumstances, and mindful Juror Number One was dismissed prior to the jury's deliberations, we discern no reversible error in the judge's handling of Juror Number One.

Finally, in Point VII, defendant argues for the first time on appeal that the State may have failed to provide a supplemental police report to the defense.

This report was addressed at trial and the judge ordered the prosecutor to locate and provide a copy of the report to defense counsel. He also advised he might provide a Clawans[3] charge to the jury if the report was not produced. Such an adverse-inference charge is a permissible remedy for a discovery violation. State v. Dabas, 215 N.J. 114, 140 (2013). It is unclear on this record if the report was produced, but it is uncontroverted that defendant never requested an adverse inference charge based on the lack of its production. Also, defense counsel did not mention the supplemental report during the remainder of the trial. Under these facts, we are satisfied no appellate remedy is warranted on this issue.

Any remaining claims raised by defendant lack merit and require no further discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3] State v. Clawans, 38 N.J. 162 (1962). A Clawans charge allows a jury to draw an adverse inference against a party when that party's failure to present evidence "raises a natural inference that the party so failing fears exposure of those facts would be unfavorable." Id. at 170 (citation omitted).