**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1867-24

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RONALD C. SMITH,

     Defendant-Appellant.

_____

        Argued April 21, 2026 – Decided May 4, 2026

        Before Judges Susswein and Chase.

        On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 22-09-0571.

        John S. Furlong argued the cause for appellant (Furlong & Kransy, attorneys; John S. Furlong, on the brief).

        Brian J. Uzdavinis, Deputy Attorney General, argued the cause for respondent (Jennifer Davenport, Attorney General, attorney; Deborah Bartolomey, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Following an unsuccessful motion to suppress evidence, defendant Ronald Smith entered a negotiated guilty plea to second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1).  He was sentenced in accordance with the plea agreement to a five-year prison term, with a forty-two-month parole ineligibility term in accordance with the Graves Act, N.J.S.A. 2C:43-6. Defendant now appeals from the April 19, 2023 Law Division order denying his suppression motion, raising the following points for our consideration:

> POINT I
>
> THE STOP WAS UNSUPPORTED BY REASONABLE AND ARTICULABLE SUSPICION, WHERE NEITHER THE ALLEGED WINDOW TINT VIOLATION NOR THE FAILURE TO SIGNAL CONSTITUTED A VALID BASIS.
>
> > A. The officer's ability to see through the tinted window defeated the basis for a violation of N.J.S.A. 39:3-74 under State v. Smith.[1]
> >
> > B. The alleged failure to signal did not justify the stop because no traffic was affected and the officer misunderstood the statute.
> >
> > C. The pretextual nature of this stop requires heightened scrutiny and strict adherence to constitutional standards.

---

[1]  251 N.J. 244 (2022).

2

POINT II

EVEN IF THE STOP WERE VALID, THE OFFICER LACKED A LAWFUL BASIS TO REMOVE AND FRISK [DEFENDANT].

POINT III

THE OFFICER'S MANIPULATION OF THE OBJECT IN [DEFENDANT'S] POCKET VIOLATED THE PLAIN FEEL DOCTRINE.

After reviewing the record in light of the contentions advanced on appeal, we affirm.

I.

We derive the following facts from the evidentiary hearing conducted by the trial judge including the body worn camera ("BWC") footage that captured the incident. On the night of June 25, 2022, Trenton police department Detective Kulis and his partner ("the Officers") were parked on the south-bound shoulder of Martin Luther King Boulevard. As part of a directed traffic enforcement detail, the detectives were tasked with "providing extra attention to [Martin Luther King Boulevard and East Paul Avenue], a high crime area[] where there [had] been shootings, distribution of [controlled dangerous substances ("CDS")], and other violations."

3

At approximately 10:22 p.m., the Officers observed a gray Nissan Maxima that they believed violated the relevant motor vehicle code because of tinted windows. Although Detective Kulis' report does not specify which windows were improperly tinted, he noted on direct and cross examination that it was the "front windows." Additionally, the Officers observed the driver of the Nissan make an illegal right-hand turn onto East Paul Avenue without using a turn signal. Detective Kulis could not recall if there were other vehicles in proximity to the Nissan at the time.

After observing these purported motor vehicle violations, the Officers positioned their police vehicle behind defendant's Nissan, activated their emergency lights, and initiated a traffic stop. Defendant did not immediately pull over his vehicle; instead, defendant continued to drive slowly for approximately one block. Defendant then stopped his vehicle in the middle of the intersection between East Paul Avenue and Chase Street, blocking traffic at the intersection.

The Officers exited their vehicle and Detective Kulis approached the driver's side and his partner approached the passenger's side. Detective Kulis used his flashlight, "because [he] couldn't clearly see into the car[,]" to illuminate the interior of the vehicle. At this time, Detective Kulis testified he

4

saw "defendant . . . stuffing an unknown object with his right hand between the driver's seat and the vehicle[']s center console."  When Detective Kulis reached defendant's vehicle, defendant rolled down his window and was removing his wallet with his right hand from what appeared to be, his back right pocket.  Thereafter, defendant provided all documents to Detective Kulis.

Detective Kulis then ordered defendant to step out of the vehicle and defendant complied.  Defendant was instructed to place his hands on the top of the vehicle and Detective Kulis conducted a "pat frisk" to ensure defendant was not possessing weapons on his person.  While frisking defendant, Detective Kulis "felt a hard rock-like substance" in defendant's front right pocket "which [he] recognized as CDS."  Detective Kulis testified that he immediately recognized the item as crack cocaine because, in his five-years on the force, he had encountered crack cocaine "approximately 250 times before."

Upon feeling the "baggie," Detective Kulis believed it to be crack cocaine. The BWC video appears to reflect that he asked defendant "what's here" upon feeling the item.  Defendant replied, "it's coke."  Defendant was placed under arrest, and Detective Kulis removed the crack cocaine and $1,300 from defendant's pocket.

A-1867-24

After discovering the crack cocaine, Detective Kulis suspected that defendant was involved in distributing the substance because: (1) he believed it to be roughly nine grams, "a distributable amount" of crack cocaine; (2) defendant was not in possession of any paraphernalia which would be required for ingestion of crack cocaine; and (3) defendant had $1,300 in cash on his person. Accordingly, Detective Kulis "decided to conduct [an] additional search of the vehicle for additional contraband which would be a weapon or additional CDS crack cocaine."

Detective Kulis and other officers then began a comprehensive search of defendant's vehicle. The searched areas of defendant's vehicle, where no contraband was located, included: (1) the area between the center console and driver's seat where Detective Kulis saw defendant appear to be stuffing something; (2) the backseat passenger area; (3) the driver's side door and beneath the power window control panel[2]; (4) the trunk, including bags and boxes contained within the trunk; (5) the passenger's side door and beneath the power window control panel; (6) the glove compartment; (7) underneath/behind the paneling on the sides of the front dashboard; and (8) the center console.

---

[2] Detective Kulis utilized what appears to be a pocketknife to pop up/out certain components of defendant's vehicle.

A-1867-24

Thereafter, Detective Kulis, after preparing to allow defendant's passenger leave in the vehicle, decided to check more locations. He checked again in the front and rear passenger compartments, and then "ultimately found a handgun" shoved underneath the driver's seat. Defendant had neither a license nor a permit to carry and upon review of his criminal history, was determined to be a certain person not to possess firearms.

Defendant was subsequently indicted by a Mercer County Grand Jury with: (count one) third-degree possession of a CDS, N.J.S.A. 2C:35-10a(1); (count two) third-degree possession of a CDS with intent to distribute, N.J.S.A. 2C:35-5a(1) and N.J.S.A. 2C:35-5b(3); (count three) second-degree possession of a firearm during the commission of a CDS offense, N.J.S.A. 2C:39-4.1a; (count four) third-degree possession of a CDS on or near school property, N.J.S.A. 2C:35-7; (count five) second-degree possession of a CDS on or near certain public property, N.J.S.A. 2C:35-7.1a; (count six) second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5b; and (count seven) second-degree certain persons not have weapons, N.J.S.A. 2C:39-7b(1).

Defendant then moved, pursuant to Rule 3:5-7, to suppress the evidence seized without a warrant. The motion court heard testimony on two dates. The State presented Detective Kulis as its sole witness and defendant presented: (1)

A-1867-24

defendant's passenger at the time of the stop, Dontate Brown; (2) defendant's passenger's wife, Lisa Green; and (3) Mercer County Prosecutor's Office Detective Michael Staton. The motion court found each of the four witnesses to be credible.

Dontate Brown testified that he and defendant were friends and that the two were headed to a bar when they were stopped by police. Additionally, he testified he had neither seen nor been aware of the firearm that Detective Kulis found under defendant's seat.

Lisa Green testified that her husband called her during the incident, roughly twenty minutes after he had left home, and she arrived on the scene and recorded a video of the incident. Further, she confirmed her husband neither owns a gun nor was he in possession of one on June 25, 2022.

Lastly, Detective Staton testified that he brought the crack cocaine seized on June 25, 2022, from the Trenton Police evidence room to the court room. The judge then held the crack cocaine and used his "thumb, forefinger, and index finger to manipulate the lump of . . . [crack] cocaine that [was] in [the] bag[.]"

On April 19, 2023, the court read its opinion into the record and denied defendant's motion to suppress. In doing so, the court made the following findings of fact: (1) Detective Kulis and his partner were patrolling a high crime

area known for shootings and CDS violations; (2) Officers observed that defendant's vehicle had improperly tinted front windows and that defendant failed to signal when turning; (3) although Detective Kulis could not recall if there were other cars on the road, the video showed other vehicles driving by—thus, traffic was affected by defendant's failure to signal; (4) defendant did not immediately pull over and proceeded for between 300 and 500 feet before yielding to the officers; (5) defendant was seen appearing to hide something between the driver's seat and the center console; (6) defendant was removing his wallet when Detective Kulis reached the vehicle; (7) based on defendant's actions the officer suspected he was armed—therefore, defendant was removed from the vehicle; (8) while frisking defendant, Detective Kulis was able, based on his training and experience, to identify a rock of crack cocaine that was larger than a quarter in size; (9) Detective Kulis searched the car for additional contraband based on defendant's actions coupled with finding $1,300 and a lack of a paraphernalia; and (10) Detective Kulis found a firearm under the driver seat.

Defendant pled guilty to second-degree unlawful possession of a weapon and received a five-year custodial sentence with forty-two months of parole

A-1867-24

ineligibility. This appeal, challenging the court's order denying his motion to suppress physical evidence follows. See R. 3:5-7(d).

## II.

Our appellate function in this search-and-seizure context is well established. Our review of a trial court's decision on a motion to suppress evidence is circumscribed. See State v. Fenimore, 261 N.J. 364, 372-73 (2025); State v. Amang, 481 N.J. Super. 355, 374 (App. Div. 2025) (quoting State v. Nyema, 249 N.J. 509, 526 (2022)) ("The 'standard of review on a motion to suppress is deferential.'"). In general, appellate courts must "'uphold the factual findings underlying the trial court's decision so long as those findings are "supported by sufficient credible evidence in the record."'" Nyema, 249 N.J. at 526 (quoting State v. Ahmad, 246 N.J. 592, 609 (2021) (quoting State v. Elders, 192 N.J. 224, 243 (2007))). "[F]indings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).

After a testimonial hearing, we "defer to the trial court's factual findings because the trial court has the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v.

10

S.S., 229 N.J. 360, 374 (2017) (quoting Elders, 192 N.J. at 244); see also State v. Locurto, 157 N.J. 463, 474 (1999) (recognizing deference is afforded because the court's findings "are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record") (citations omitted).  Therefore, we "must defer to the factual findings of the trial court on a motion to suppress so long as its findings are supported by sufficient credible evidence in the record."  State v. Erazo, 254 N.J. 277, 297 (2023).  Our deference includes the trial court's findings based on video-recorded or documentary evidence.  See S.S., 229 N.J. at 374-81 (clarifying the deferential and limited scope of appellate review of factual findings based on video-recorded evidence); see also State v. Tillery, 238 N.J. 293, 314 (2019); State v. McNeil-Thomas, 238 N.J. 256, 271-72 (2019). "A trial court's legal conclusions, 'however, and the consequences that flow from established facts,' are reviewed de novo."  State v. Bullock, 253 N.J. 512, 532 (2023) (quoting State v. Hubbard, 222 N.J. 249, 263 (2015)).

The substantive principles of search-and-seizure law are also well settled. The Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee the right of people to be secure against unreasonable searches by requiring warrants issued upon

probable cause.  Nyema, 249 N.J. at 527.  Under both constitutions, "searches and seizures conducted without warrants issued upon probable cause are presumptively unreasonable and therefore invalid."  State v. Goldsmith, 251 N.J. 384, 398 (2022) (quoting Elders, 192 N.J. at 246).  To overcome this presumption, "the State must show by a preponderance of the evidence that the search falls within one of the well-recognized exceptions to the warrant requirement."  State v. Smart, 253 N.J. 156, 165 (2023) (citing State v. Manning, 240 N.J. 308, 329 (2020)).

"[T]he 'touchstone' for evaluating whether police conduct has violated constitutional protections is 'reasonableness.'  The reasonableness of police conduct is assessed with regard to circumstances facing the officers, who must make split second decisions in a fluid situation."  State v. Bard, 445 N.J. Super. 145, 157 (App. Div. 2016) (quoting State v. Hathaway, 222 N.J. 453, 476 (2015)).  We now apply this framework to the present facts with careful attention to the timing and chronology of events.

A.

Defendant begins by challenging the stop of his motor vehicle.  He asserts that the police did not have reasonable suspicion that a motor vehicle violation

occurred for either tinted windows or for failure to properly use his turn signal. We are not persuaded.

"A lawful roadside stop by a police officer constitutes a seizure under both the Federal and New Jersey Constitutions." State v. Dunbar, 229 N.J. 521, 532-33 (2017) (citing Arizona v. Johnson, 555 U.S. 323, 333 (2009) and State v. Scriven, 226 N.J. 20, 33 (2016)). In Delaware v. Prouse, the United States Supreme Court held that police may stop a vehicle only if they have a reasonable and articulable suspicion that a motor vehicle offense has been committed. 440 U.S. 648, 663 (1979). Therefore, a police officer is justified in stopping a vehicle where the officer suspects the driver committed a motor vehicle violation. State v. Locurto, 157 N.J. 463, 470 (1999) (citing State v. Smith, 306 N.J. Super. 370, 380 (App. Div. 1997)).

In State v. Bacome, our Supreme Court reaffirmed that "[t]o be lawful, an automobile stop 'must be based on reasonable and articulable suspicion that an offense, including a minor traffic offense, has been or is being committed.'" 228 N.J. 94, 103 (2017) (quoting State v. Carty, 170 N.J. 632, 639-40 (2002)); see also State v. Bernokeits, 423 N.J. Super. 365, 370 (App. Div. 2011) ("A motor vehic[le] violation, no matter how minor, justifies a stop without any reasonable

suspicion that the motorist has committed a crime or other unlawful act." (citing Prouse, 440 U.S. at 663)).

Reasonable and articulable suspicion is a "lower standard" than probable cause, State v. Stovall, 170 N.J. 346, 356 (2002), and requires a court to evaluate the totality of the circumstances, State v. Alessi, 240 N.J. 501, 518 (2020) (citing State v. Pineiro, 181 N.J. 13, 22 (2004)). The reasonable suspicion standard requires "some minimal level of objective justification for making the stop." State v. Nishina, 175 N.J. 502, 511 (2003) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). "[R]aw, inchoate suspicion grounded in speculation cannot be the basis for a valid stop." Scriven, 226 N.J. at 34. A judge must consider the totality of the circumstances, viewing the "whole picture" rather than taking each fact in isolation. State v. Nelson, 237 N.J. 540, 554-55 (2019) (quoting Stovall, 170 N.J. at 361). Courts should give weight to "'the officer's knowledge and experience' as well as 'rational inferences that could be drawn from the facts objectively and reasonably viewed in light of the officer's expertise.'" State v. Citarella, 154 N.J. 272, 279 (1998) (quoting State v. Arthur, 149 N.J. 1, 10-11 (1997)).

N.J.S.A. 39:3-74, provides, in relevant part, "[n]o person shall drive any motor vehicle with any . . . non-transparent material upon the front

14

windshield . . . or front side windows of such vehicle." In State v. Smith, our Supreme Court held "reasonable and articulable suspicion of a tinted windows violation arises only when a vehicle's front windshield or front side windows are so darkly tinted that police cannot clearly see people or articles within the car." 251 N.J. at 253. Therefore, the Court held that "[i]n order to establish a reasonable suspicion of a tinted windows violation under N.J.S.A. 39:3-74, the State will . . . need to present evidence that tinting on the front windshield or front side windows inhibited officers' ability to clearly see the vehicle's occupants or articles inside." Id. at 266.

Smith applies here, but the error the police made in Smith was not repeated. First, the only basis for the stop in Smith was defendant's rear tinted windows. Id. at 252. In contrast, Detective Kulis testified and the BWC reflects it was the front windows of the vehicle that were tinted. Second, in Smith, it was the cumulative effect of the police SUV's headlights and the street lighting that allowed the police to see into the vehicle. 251 N.J. at 265-66. Contrary to defendant's argument, the detective testified repeatedly he could not see through the heavily tinted front driver-side window. The detective's testimony was corroborated by the court's review of the BWC of the tinted windows presented at the hearing. Based on the credible testimony, the motion court then found the

detective could not clearly see the occupants of the vehicle through the front driver-side window.  See State v. Reece, 222 N.J. 154, 166 (2015) (citing Locurto, 157 N.J. at 474) (stating credibility and factual determinations should not be altered unless there is "obvious" and "exceptional" error); S.S., 229 N.J. at 379-80 (rejecting de novo review of video evidence and affirming the deferential standard of review).  Thus, there is no basis for us to disturb the court's factual findings and legal conclusions that the State established reasonable and articulable suspicion that the windows violated N.J.S.A. 39:3-74.

Defendant also challenges whether there was reasonable suspicion to stop the vehicle under N.J.S.A. 39:4-126 for not using his turn signal.  He argues that since traffic was not affected there was no violation.  Because we determine that the police lawfully stopped the vehicle based on the tinted windows, it is not necessary for us to decide this issue.

B.

Defendant also believes the court erred in finding that his removal from the car was appropriate.  This argument is without merit.

It is objectively reasonable for a police officer to order a driver out of a lawfully stopped vehicle, as "removal [is] only a minor intrusion into a driver's

personal liberty." State v. Bacome, 228 N.J. 94, 104 (2017) (citing Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977)). "The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it." Mimms, 434 U.S. at 111. "What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." Bernokeits, 423 N.J. Super. at 371 (quoting Mimms, 434 U.S at 111).

## C.

Defendant next argues the detective did not have a reasonable suspicion that he was presently armed or dangerous. Therefore, he asserts a Terry[3] pat down was unwarranted. We reject this argument and agree with the motion court that the detective was justified in conducting a pat down of defendant for weapons.

"If, during the course of the stop or as a result of the reasonable inquiries initiated by the officer, the circumstances 'give rise to'" reasonable, articulable suspicion that the motorist is involved in criminal or unlawful activity, the officer may broaden the inquiry of the detention. Bernokeits, 423 N.J. Super. at 371 (quoting State v. Dickey, 152 N.J. 468, 479-80 (1998)) (internal quotations

---

[3] Terry v. Ohio, 392 U.S. 1, 29 (1968).

omitted). Moreover, a law enforcement officer, for their own protection and safety, may conduct a pat-down to find weapons that they reasonably believe or suspect "are then in the possession of the person" they have lawfully stopped. State v. Privott, 203 N.J. 16, 30 (2010) (citing Ybarra v. Illinois, 444 U.S. 85, 93-94 (1979)). "Because the intrusion is designed to protect the officer's safety, the standard governing protective searches is 'whether a reasonably prudent [person] in the circumstances would be warranted in [their] belief that [their] safety or that of others was in danger.'" State v. Roach, 172 N.J. 19, 27 (2002) (quoting State v. Valentine, 134 N.J. 536, 543 (1994)). "The officer must be able 'to point to particular facts from which [they] reasonably inferred that the individual was armed and dangerous.'" State v. Thomas, 110 N.J. 673, 679 (1988) (quoting Sibron v. New York, 392 U.S. 40, 64 (1968)).

We apply "an objective test [to] determine[e] whether, under the totality of the circumstances, a police officer's" frisk was reasonable. Pivott, 203 N.J. at 30 (citing Arthur, 149 N.J. at 7-8). Under this standard, "various circumstances" may create an objective reasonable suspicion that a suspect is armed. Thomas, 110 N.J. at 679. Furthermore, as the Supreme Court noted in Terry, "absolute[] certain[ty]" that a suspect is armed is not required; instead, the question is whether, under the totality of the circumstances, "a reasonably

18

prudent man . . . would be warranted in the belief that his safety or that of others was in danger."  392 U.S. at 27.

In Valentine, the Court noted that certain factors—high crime area or the late hour—alone, may not justify a frisk for weapons.  134 N.J. at 547. "However, the lateness of the hour, like the location at which such a stop occurs, justifiably elevate[s] a police officer's reasonable belief that a suspect is armed and dangerous."  Ibid.; see also State v. Lund, 119 N.J. 35, 48 (1990) ("furtive movements or gestures by a motorist, accompanied by other circumstances, will ripen into a reasonable suspicion that the person may be armed and dangerous or probable cause to believe that the person possesses criminal contraband").

In assessing the totality of the circumstances, Detective Kulis was reasonable in his pat down of defendant because:  (1) the stop occurred in a high crime area specifically known for shootings and drug crime; (2) after Detective Kulis activated his emergency lights, defendant continued to drive slowly for one block and eventually stopped, haphazardly, in the middle of an intersection; (3) the stop occurred at 10:30 p.m. and, given the tints on defendant's windows, Detective Kulis could not clearly ascertain what was happening in the vehicle; and (4) coupled with the uncertainty of what was occurring in the vehicle, when he illuminated the interior of the car, Detective Kulis observed defendant appear

to be stuffing something between the driver's seat and the center console. These findings comport with the ruling of the motion court. Under the totality of the circumstances, Detective Kulis was justified in conducting a pat down to ensure the safety of himself and his partner.

D.

We also find that the motion court correctly concluded that Detective Kulis did not violate the plain feel doctrine during the pat down. While conducting his pat down, it was readily apparent to the detective that defendant had crack cocaine in his pocket.

The seminal Supreme Court case, Minnesota v. Dickerson, established the plain feel doctrine; there, the Court stated:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.
>
> [508 U.S. 366, 375-76 (1993).]

The New Jersey Supreme Court, in State v. Evans, adopted the plain feel doctrine and "ratif[ied] the United State Supreme Court's reasoning in Dickerson." 235 N.J. 125, 138 (2018). In Evans, the Court held:

20

> "[T]actile discoveries of contraband" may justify a warrantless search under certain circumstances. Specifically, contraband found during the course of a lawful pat down may be seized without a warrant if the officer "feels an object whose contour or mass makes its identity immediately apparent."
>
> [Ibid. (quoting Dickerson, 508 U.S. at 375-76).]

Therefore, a protective frisk must be confined in scope to an intrusion designed only to reveal weapons, not CDS, and can be conducted only by a carefully limited pat-down of outer clothing to determine whether the defendant has a weapon that might be used to assault the officer rather than an under-the-clothing search. Roach, 172 N.J. at 27 (citing Terry, 392 U.S. at 30). "Nothing in Terry can be understood to allow a generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons." Privott, 203 N.J. at 30 (quoting Ybarra, 444 U.S. at 93-94). In Privott, the Court noted that "[o]ur jurisprudence attempts to strike a balance between the competing interests of an individual's right to privacy and the need to protect the police from person with weapons." Id. at 32.

Defendant's reliance on State v. Jackson, 276 N.J. Super. 626 (1994), is misplaced. In Jackson, an officer conducted a permissible pat down for weapons when he felt a "hard but flexible" object in Jackson's jacket pocket, which was later determined to be cocaine. Id. at 629. However, the officer admitted that

21

the object did not feel like a weapon. Thus, we held the officer's search exceeded the scope necessary to determine if the suspect was armed. Id. at 630. Unlike in Jackson, in State v. Cargill, during the pat down, the officer identified a "hard package of crack cocaine by plain touch." 312 N.J. Super. 13, 17 (App. Div. 1998), certif. denied, 156 N.J. 408 (1998). We then determined the evidence was admissible. Ibid.

Detective Kulis's pat down of defendant is consistent with our holding in Cargill. In Cargill, we distinguished Dickerson and Jackson by noting that "the judge who heard the testimony in the suppression hearing believed the trooper's testimony respecting immediate recognition, by touch and experience, of the probable nature of the hard object detected during pat-down of the bulge." Ibid. Likewise, after hearing the testimony and watching the video, the motion court determined it was readily apparent to the detective that defendant had crack cocaine in his pocket. Moreover, the court stated, that "the evidence presented suggests that the intrusion of the frisk of the outer clothing of the defendant that occurred in at least under one minute was reasonably designed to discover weapons." We discern no basis to disturb the motion court's decision. The court's factual and credibility findings were "supported by sufficient credible

22

evidence in the record." State v. Dunbar, 229 N.J. 521, 538 (2017) (quoting Hubbard, 222 N.J. at 262).

To the extent we may not have addressed them, we reject the remainder of defendant's arguments as lacking in merit. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division